Judge Carr
delivered his opinion.
Doctor Savage, a resident of North Carolina, held a tract of 1500 acres of land in Culpeper county, by deed from *586 the proprietor of the Northern Neck, bearing date in 1779. jn Savage, by will, devised this land to Edward Rice, then also a resident of North Carolina. In 1787, 900 acres of this land were sold by the deputy sheriff of Culpeper, J. Strother, for non-payment of taxes due thereon, and bought by himself. He afterwards sold to Nolle, a purchaser with notice of the title which Strother held. After the death of Savage, (but at what particular period does not appear,) Edward Rice.became an inhabitant of Virginia; and (himself and his brother Francis, being indebted by bond to Heathcote and Fenwick, 943l. 6s. Id.) he entered into a contract to sell them his Culpeper land, according to the valuation of certain persons named. This contract was never executed. Heathcote and Fenwick sued the Rices, and obtained judgment. Edward died, without heirs who could inherit, and no will (if he left one) has ever been proved. Fenwick, surviving partner, filed this bill for a sale of the Culpeper land, under the agreement of E. Rice, or the lien of his judgment. Nolle, who bought of the sheriff, was made a party. He answered, died subsequently, and those who claim under him are before the Court upon answers.
The first point for discussion is, whether Rice had a good title; for if not, Fenwick can have no claim to a sale of the land. This point divides itself into two questions. 1. Had Rice a capacity to take and hold land? 2. Was the will of Savage so proved as to pass land ? If these two questions bo settled affirmatively, then a third will be, was the sale of the land for non-payment of taxes, a valid one?
1. As to the first, it is asserted, that Rice could not hold land, because he was an alien. That he was an Irishman by birth, is agreed on all hands. This throws on the plaintiff the burthen of proof. He must shew, either an actual qualification of Rice as a citizen; or such facts and circumstances, as, after this length of time, will authorise us to presume, that such qualification did take place. N° positive proof on the subject is furnished by the record; but, *587 of presumptive evidence there is no stint. Seven witnesses (and some of them I should take to be very intelligent men,) express their confident belief, that Rice had taken the oaths required by North Carolina, to make him a citizen of that State; and they relate facts, which strongly corroborate their opinion. They say he was an active partizan at elections, and voted both in North Carolina, and after he removed to this State: that such was the temper of the times, and the watchful jealousy of Americans towards foreigners,.(as he was known to be,) that it would have been impossible for an alien to' have acted as he did, with impunity; and indeed, that no such would have been permitted to remain in the country. Saterfield says, he knew him as an inhabitant of Edenton (North Carolina,) in 1779, if not earlier, and is well satisfied that he could not have remained, without taking the oath of allegiance to the State* Collins also knew him in 1779, and gives the same opinion as to the temper of the times. Ellison authenticates a deed, from Savage to Rice for land, in 1783; says they were men of too much intelligence, not to know that an alien could not hold land; and that if they had not known, the father of the deponent (who witnessed the deed) certainly did know it, and would have set them right. After his removal to Virginia, several witnesses speak of his activity and zeal at elections; and two, Cowper and Lugg, say, that he was once a candidate to represent the county of Princess Anne in the Legislature. The correspondence between Rice and Savage, beginning in April 1779, shews him to have been then in the employment of Savage, who, (from his letters,) I consider to have been a shrewd, sensible man of business. It is clear from these letters, that Rice possessed his confidence in a high degree. There arc articles of co-partnery between them, which shew that they went into trade on joint stock. If all this mass of evidence, after the lapse of 45 years, be not sufficient to authorise the conclusion that Rice was a. citizen, what less than point blank proof will do ? I confess I feel as well *588 satisfied of the fact, as if I had before me the certificate* ¡n ¿¡ue f01.m> 0f the magistrate who administered the oaths under the act of 1777, spoken of by Ellison. Such a certificate might be forged, but it is impossible to doubt the truth of the facts stated by these witnesses; nor can I conceive how they could have happened, unless Rice had been a citizen. I conclude that he was a citizen.
2. Was the will of Savage so proved as to pass lands? In England, the decision of the Ecclesiastical Court upon the probate of a will of personals, was held conclusive evidence that it was the testament of the party, to the full extent to which that Court had admitted it to probate. Thus in North v. Wells, Swinb. 412, citing 1 Lev. 235, the plaintiff gave in evidence probate of a will, to prove an executrix; and the defendant would have proved that the will was forged; but he was not admitted to such proof, because it was against the seal of the ordinary, in a matter proper for his jurisdiction.
In Chichester v. Philips, Sir Thomas Raymond, 404, it-was held, that probate granted by the Ecclesiastical Court, is not traversable, but conclusive evidence of the will. With us, Courts of probate have equal jurisdiction over a testament of personals and a will of lands. By the Statute of 1785, it is enacted, “that when any will shall be exhibited to be proved, the Court having jurisdiction, may proceed immediately to receive probate. ’If any person interested shall, within seven }'ears, appear, and by his bill contest the validity of the will, an issue shall be made up, whether the writing be the will of the testator, &c.; but no such party appearing within that time, the probate shall be forever binding.”
On the 19th of June, 1789, the will in the case before us was admitted by the General Court to full probate, “ as and for the last will and testament of the said William Savage.” This suit was not commenced, until the 2d of December, 1799; upwards of ten years after the probate, Can we now call in question the probate of this will, or *589 it in any way ? The law says not. It says that no aarty appearing within seven years to contest the will, the probate shall be forever bindingand so say the decisions of this Court. Bagwell v. Elliott, 2 Rand. 198. West v. West’s ex’r. 3 Rand. 373.
But, if the time had not elapsed, and we were free to question this probate, I should strongly incline to the opinion, that the General Court did right in receiving it. The will was executed in North Carolina; the witnesses attested it there; and we must presume that their residence was there. The will was afterwards brought to this State, to be proved ih the General Court, as the lands lay here. I understand the entry on the records of the General Court, to be this: “that Cosmo Medici, a witness to the will, proved it according to law; and that he also deposed, that Routhack and John Routhack, the two other witnesses to the same, subscribed their names thereto at the request, and in the presence of the said William Savage; and it appearing to this 6-ourt, that every legal means have been taken by the said Edward Rice, to procure the attendance at this Court, of the said Routhack and John Routhack, who are out of this State, to testify concerning the said will, and they not appearing, therefore it is ordered, that the said writing be recorded, as and for the last will and testament of the said William Savage, on the evidence of the said Cosmo Medici.” The witnesses residing out of the State, and every legal means having been taken to procure their attendance, without effect, it would seem to present the same case as if they were dead. They were equally beyond the power of the Court; and in ease of their death, I presume there could be no doubt that their attestation might be proved by the remaining witness; or that, if Ml had been dead, their hand-writing might be proved.
It was said in the argument, that the mode prescribed in the act, “ prescribing the method of proving certain wills,” 12 Hen. Stat. at Large, 502, ought to have been pursued; *590 but I consider the provisions of that Statute, as made in aid of parties claiming under a will, and giving them an additional mode of proceeding; not depriving them of any which they might have pursued before. I therefore incline to think, that if this question were open, the decision of the General Court would be approved; but as it is not open, I would not be considered as giving a decided opinion on the point.
3. The third and great point in the cause, relates to the sale of the land made by the sheriff. It is contended for the appellants, that it is a good and valid sale; by the appellees, that it is invalid and void. As a general proposition, it will scarcely be controverted, that where a naked power is given by law, to an officer or other person, that power must be strictly pursued; especially if, by the exercise of that power, the estates or rights of others, may be forfeited and lost; and it will devolve on him who claims a right under the exercise of such power, to shew that it was, in all respects, exactly pursued. —■
In proof of this, there could not be a case stronger or more exactly in point, than that of Williams v. Peyton, 4 Wheat. 77. That was an ejectment brought by theoriginal patentee, against a purchaser at a sale made for nonpayment of the direct tax imposed by an act of Congress. The plaintiff exhibited his title. The defendant gave in evidence the books of the supervisor, shewing that the tax on the land was charged to the plaintiff; and that it had been sold for the non-payment thereof. He also gave in evidence the deed of the Marshal, executed in pursuance of the- act of Congress; and proved by the plaintiff’s agent that he did not pay the taxes, or redeem the land. Upon this evidence, the Court below instructed the jury, that the purchaser, under the sale of lands for the non-psFfment of the direct tax, to make out title, must shew, that the collector had advertised the land, and performed the other requisites of the law; otherwise, he made out no title; and that the Marshal’s deed and the other evidence were not *591 prima facie evidence, that the land had been advertised, or the requisites of the law complied with. On appeal, this instruction was decided by the Federal Court to be correct. Chief Justice Marshall delivered the opinion of the Court. In his own clear and strong manner, he says, “ It is a general principle, that the party who sets up a title, must furnish the evidence necessary to support it. If the validity of a deed depends on an act in pais, the party claiming under that deed, is as much bound to prove the performance of that act, as he would be bound to prove any matter of record on which its validity might depend. It forms a part of his title; it is a link in the chain which is essential to its continuity, and which it is incumbent on him to preserve.” The act under which the land was sold, directedstbat it should be advertised for two months, in six different public places within the district, and in two Gazettes in the State, if there be so many. Upon this part of the case, the Chief Justice observes, “The purchaser ought to preserve these Gazettes, and the proof that these publications were made. It is imposing no greater hardship on him to require it, than it is to require him to prove that a power of attorney, in a case in which his deed had been executed by an attorney, was really given by the principal. But, to require from the original proprietor proof that these acts were not performed by the collector, would be to impose on him a task, always difficult, and sometimes impossible to be performed.”
The same principle is strongly laid down in Hopkins v. Yancey, 1 Munf. 318, and Christy v. Minor, 4 Munf. 431.
In 1781, the Legislature passed a law, entitled “an act for ascertaining certain taxes and duties, and for establishing a permanent revenue.” 10 Hen. Stat. at Large, 501. By it, (among other things) it is directed, that the several County Courts shall annually, at their February Court, appoint three reputable freeholders of the county, to be commissioners to ascertain the value of all the lands within the *592 same, (except their own:) that'after taking the oath pre-' scribed, the two first named shall proceed to take an account in writing, of the quantity of the lands, and the names of the proprietors thereof, and shall ascertain their value by the acre: that they shall make out a fair list of the names of the owners of lands and lots, and the quantity and value of the lands belonging to each; and shall return the same to the clerk of the Court of their county, by the 1st of June annually: that each clerk shall file the list in his office, and make out three fair copies; one he shall deliver to the Auditor, by 1st of August annually; another, set up at the Court-house, on the next Court day; and the third, deliver to the sheriff or collector by the 10th of June in each year. The law then fixes the land tax at one pound in the hundred, on the assessed value; and goes on to lay taxes on persons and personal property. After the 1st of June, the sheriff, may collect taxes, and after the 1st of July, may distrain the lands, slaves, goods and chattels of delinquents; and if the amount due be not paid, in five days after such distress, he may sell, giving six days notice of the day and place of sale, by advertising the same at the church or other public places in the parish, on the next Sunday after the expiration of the five days; provided, that in all cases where land shall be seized under this act, there shall be given at least four weeks notice in the public papers, before any sale shall be made of the same; and where there are other sufficient effects, no distress of land is to be made. The law then directs, that the sheriff shall account for and pay into the treasury, by the 1st of September, the full amount of taxes, &c. and on failui’e, subjects him to a judgment on motion before the General Court."
In the October session of 1782, there passed two. acts on this subject; the first, entitled “ an act to amend and reduce the several acts of Assembly, for ascertaining certain taxes and duties, and for establishing a permanent revenue, into one act.” Hen. Stat. at Large, vol. 11, p. 112; the second, entitled “an act, for equalising the land tax,” *593 These Acts make some small changes in the taxes, (one of. which will be more particularly noticed hereafter;) but they do not materially affect the great scheme for laying and collecting the taxes established by the Act of 1781. This is the Act under which the sheriff proceeded in selling the land; as his deed proves, in which he refers to this Act by its title, as that under which he had sold the land. By this Act then, we will test the correctness of his proceeding.
1. To authorise the sheriff to sell any land for non-pay. ment of taxes, he must shew that it had been actually taxed; that is, that the Commissioners had valued and rated it, and returned it in their list to the clerk. Without this,, there could be no tax collected. The sheriff would have no means to ascertain the amount; no authority to levy it. The list of the Commissioners was his guide, and his warrant of distress. We have not only the reason of the thing for this, but we have an express legislative declaration to the same effect. In the Sessions Acts of 1792, (See Old Rev. Code, vol. 1, 454, Appendix,) it is recited, that tl whereas no Commissioners had been appointed in several counties, and from the neglect of the Commissioners in returning a list of the taxable property in several other counties, by reason whereof, no collections of the public taxes have been, or could be made,” &c. We have also the case of Kinney v. Beverley, 2 Hen. & Munf. 318, deciding that lands were not liable to forfeiture under the Act of 1790, for non-payment of taxes, unless they had been assessed and listed by the Commissioners, and returned to the Auditor, &c. We have also the case of Yancey v. Hopkins, 1 Munf. 419, deciding, that if land be listed by the Commissioners in a wrong name, and sold in that name for non-payment of taxes, the sale will not affect the the.title of the true owner. This was a case decided on-the very law we are now considering. The land was sold within a few months of the time that the land in the case before us was sold; sold too and bought, as here, by. the *594 deputy sheriff; and by him sold, as here, to a purchaser with notice. Now, how can we know in this case, whether the land was listed at all, or whether listed in the proper name, unless we have the lists of the Commissioners before us ? The deed of the officer, as we have seen, is not even prima facie evidence of these facts. Nor is it asking much of the party, to require the production of this evidence. The Commissioners return annually their list to the clerk, and he is bound to file it in his office, and to make out three copies; one of these he delivers to the Auditor, and another to the sheriff himself. If this officer had lost his own copy, he might apply to the clerk’s, or the Auditor’s office, where these documents are of record, and produce copies. Here then, the very foundation of the proceeding fails.
2. Bui, secondly, it is incumbent on the appellants to shew, that the amount of taxes, for which the distress and sale were made, was actually due. The advertisement states, that the lands would be sold for taxes due on them, for the years 1782, 1783, 1784, 1785, and 1786; and the sheriff’s deed states, that the amount of taxes for which the land was sold, was 371. But, these statements are no evidence. If we had copies of the Commissioner’s lists, or of the examiner’s books, directed to be made out by the equalizing law of 1782, these documents would shew us what the lands vvere valued at; and the law would give us the per centage upon this valuation, which had been imposed as a tax. Here we should have certainty; and surely, it is not imposing too much upon the purchaser with notice, from the sheriff, to require this record evidence. This is a second vital defect in the proof necessary to support the sheriff’s sale.
3. There is a third. The Act of 1781, requires, that where land is distrained for taxes, there shall be given at least four weeks notice in the public papers, before any sale shall be made of the same. The only evidence we have of any advertisement, is a copy certified by the clerk of *595 Culpeper Court. It bears no date; but the clerk states, that the date of the Virginia Gazette, from which it was taken, was the 10th of March, 1787; and the advertisement says, “ To be sold to the highest bidder, at Culpeper Courthouse, on Wednesday the 21 si day of March next,” &c. so that taking this paper as proved, (which it is not,) the only publication was on the 10th of March, of a sale to take place on the 21st, eleven days instead of four weeks. It was contended in the argument, that no advertisement of the sale was required by the law. That the law should direct a public sale of property, without notice to be given, would be a perfect anomaly; and would lead to consequences so mischievous, that we could not, without the strongest necessity, be justified in imputing such' a course to the Legislature; especially where there has been no judicial proceeding, and where a man’s highest estate, his land, was to be forfeited and lost to him, by the summary process of distress and sale for the ñon-payment of taxes.
It is true, that the law of 1782, (“ To amend and reduce into one, the several Acts for ascertaining certain taxes and duties, and establishing a permanent revenue,”) does not contain the proviso of the Act of 1781, that where lands are seized, there shall be four weeks advertisement in the public papers, before sale; but then it does not seem to me, that this omission would amount to a repeal, as both laws might well stand together; and this seems to have been the idea of the Court, in Yancey v. Hopkins, where proof of publication was looked to. It seems to have been the cotemporaneous exposition too; for both in Yancey v. Hopkins, and in the case before us, the parties thought a publication in the papers necessary; which must have been on the idea, that this provision of the Act of 1781, was not repealed. And indeed, the sheriff, in his deed, expressly states, that the proceeding was under the law of 1781; and it must of necessity have been so, for the tax of 1782, which was due before the Act of 1782, was passed.
*596 But, if it were clear that this Act of 1782, did repeal the provisions of 1781, requiring publication, and that the clause which says, that where a distress is made, and no payment of the tax in five days, the sheriff may sell, giving six days notice, applies as well to land as to personal chattels; then it follows, that on a distress of land for non-payment of taxes, there must be six days notice of the day and place of sale, given by “ advertising the same, at the Church or other public places in the parish wherein such distress shall be, on the next Sunday after the expiration of the five days.” These are the very words of the Act of 1782; and the party, claiming under any sale made by virtue of it, would be obliged to produce the proper evidence of this advertisement having been made, at the Church, or other public places in the parish. This is the very point decided in the case of Williams v. Peyton, before quoted.
We have no proof of any advertisement here. So that, upon either hypothesis, the proof is defective of the advertisement required by law; and the sale, in my opinion, void on all the grounds I have stated.
With respect to the objection that the proper parties are not before the Court, I do not consider it well founded. The object of the plaintiff, so far as related to the claim of the Nalles, is to remove the obstruction raised by the sale of the sheriff. In order to that, it is only necessary to have before us, those who claim title under that proceeding, and they are here.
I am of opinion that the decree of the Court below, should be affirmed.
The other Judges concurred, and the decree was afi firmed.*