BnocivEnbhotjgh, J.
There are several questions in this case, on which I will briefly give my opinion. The first is whether the county court, acting as a court of probat, may not be compelled by mandamus to record the deed of emancipation in the proceedings mentioned, if the evidence offered be admissible and sufficient. On this point Dawson v. Thruston &c. 2 Hen. & Munf. 132. is decisive authority. It was there decided that the county court acts in this matter in a character merely ministerial, and when the proof is sufficient, is bound to admit the deed to record, without regard to the effect which it may have after it is recorded: and that the mandamus is the proper remedy to enforce the execution of this duty. The difference between the two cases is, that the grantor in that case, and the grantees in this, have made the application.
*697 It is contended that they have no right to this or any -ill other remedy; first, because the grantor m the deed being dead at the time of the application to admit it to probat, it will be oí’ no effect if recorded ; and secondly, because the statute points out the only mode by which slaves can sue for their freedom, namely, in forma pauperis, and as they have not pursued that method, they have no right to the mandamus.
As to the first point, I am not prepared to say that the deed will have no effect if recorded. The case of Thrift v. Hannah &c. 2 Leigh 300. does not go so far as has been supposed. That was a case of a feme sole, who executed an instrument of emancipation, which was not however perfected by acknowledgment, nor by the proper proof in court, before her marriage. By that event the property in the slaves became vested in her husband, who was a purchaser; and in a contest between the slaves and the husband, the court decided that his right should not be divested by the subsequent probat. It does not prove that where the emancipator dies between the execution and the probat of the instrument, the recording of it will not be effectual, in a contest between the pauper and the distributees or other voluntary claimants under the emancipator. It does not prove that there is no case in which the instrument, when recorded, may have relation to the period of its execution, or to some antecedent period. We know that in the case of wills granting emancipation, however long the period between the death of the testator and the probat of the will, the bequest has relation back to the death of the testator. And it is yet to be decided, where the deed does not affect intermediate vested rights, whether it may (like an escrow) or may not have relation to the first delivery to the grantee, or to the signing and sealing of it.
But if the doctrine of relation does not in any case apply to deeds of emancipation (which I cannot admit) *698 yet it does not follow that the deed should not be admitted to record. When so admitted, it may have full effect from the time of recording, against all volunteers claiming under the grantor; and at any rate it is not within the province of a court of probat to decide that matter. Their duty is to receive the proof, and if that is sufficient, to record the deed, leaving the effect of it to be decided by other tribunals.
Secondly, it is gravely argued that the slaves had no right to apply to the county court to record the deed, nor to the circuit court for a mandamus; that they can only sue in forma pauperis. This objection ought not to prevail. These slaves have already sued for their freedom in forma pauperis, and they have been repelled from the courts of common law, because their right to freedom has not been perfected. 6 Munf. 191. They have been, in effect, told by this court to go and record their deed before they sue. With what propriety, then, can the court of probat refuse to do that which is necessary to enable them to sue in forma pauperis with any prospect of success? It is true that slaves cannot hold property nor make contracts, but they can receive their freedom, and the}7 have such an interest in the deed which grants it to them, as to carry it, or have it carried, to the county court, to get it proved and recorded. If they produce the requisite proof, is not the court bound to hear it, and direct the clerk to record the deed ? and is not the clerk bound to obey the order ? If not, then may a most important law be defeated by the recusancy of these ministerial agents of the commonwealth. A privilege extended to masters, and a right conferred on their slaves, may be abrogated by an obstinate clerk and a contumacious court. I cannot think they have such-powers. If they have not, and if the slave having an inchoate right to freedom may have it perfected, it follows that he has the right to apply to a superiour court for the appropriate process to compel the perfor *699 manee of the act. It would be passing strange that the law should confer a right, and withhold the necessary means for carrying it into effect.
I must do the county court of Botetourt the justice to say that these are not the grounds on which they place their refusal. In their answer to the conditional mandamus, they sa.y that they refused to admit the deed to record because the evidence was inadmissible and insufficient; and this brings on the question whether they were correct or not in that opinion.
In the lapse of years which has occurred since this instrument was executed, the grantor has died, so that his acknowledgment of it cannot be obtained : one of the attesting witnesses is dead, and the other has removed from the commonwealth. Does the statute require that the two attesting witnesses should be personally present in court, and there prove it ? The language is, that the instrument is to be “proved in the county or corporation court by two witnesses.” There is nothing peculiar in this language, or that distinguishes it from the language of the general act for regulating conveyances. I cannot see why we should require greater strictness in construing a law which grants freedom to slaves, than one that directs a conveyance of property.
The general rule is that every bond, deed or other instrument produced in evidence, the execution of which is attested, must be proved by the witness himself, if he can be produced. But if he be dead,secondary evidence may be resorted to, and you may prove his handwriting. So if the witness resides in another country, you may prove his handwriting. 2 East 250. The same rule prevails as to the proof of wills, both in courts of common law and in chancery. 4 Yeates 845. 5 Ves. 404. In wills devising lands, the witnesses are called to prove not only the execution of the will by the testator, but that they attested it in his presence ; and if the *700 doctrine be correct as to wills, that you may prove the handwriting of a dead or absent witness, it is a fortiori true as to deeds.
I can see no reason why the principles of evidence which are adopted by courts of law and equity, should not gui”de the courts of probat. They were adopted by the court which admitted to probat the will of Mutter, on proving the handwriting of the two witnesses, one of whom resided in Maryland and the other in Massachusetts, Tate’s Dig. p. 524. note, and by the general court sitting as a court of probat, in the case referred to by judge Carr in Nalle v. Fenwick, 4 Rand. 589.
In the case before us, one of the witnesses to the instrument of emancipation is dead, and his handwriting is proved. The other witness, though living, is a resident of the state of Illinois, and is beyond the reach of the process of our courts. It would have been sufficient to prove his handwriting also. But he furnishes still more satisfactory evidence. His deposition has been regularly taken; and with the deed before him, he proves the execution of it by the grantor, and his own attestation to it. I certainly think that the. language of the statute has been complied with, and that this instrument has been “ proved in the county court by two witnesses.”
The result is, that the judgments of both courts are wrong and should be reversed, and that the circuit court should be directed to award a perenqDtory mandamus requiring the county court to admit the instrument to record.
Care, J.
Have the courts below erred, and if so, has the case been properly brought before us ? To decide whether there is error in the judgments of the inferiour courts, two questions are necessary to be considered : 1, Could the plaintiffs in error present the deed of emancipation for probat? 2. Was there sufficient proof to admit the deed to record ?
*701 As to the first: it is a rule too well known to need repeating, that we should always, m construing laws, look first to the inconvenience meant to be remedied, and then to the means used, and so apply the latter as to effectuate the former, so far as we properly can. Before the act of 1782, a master could not free his slave : that law intended to enable him to do so, in two ways ; by will, or by any other instrument- in writing under hand and seal, attested and proved by two witnesses, or acknowledged by the grantor in the court of the county where he resides. 1 am far from supposing that in deciding on cases of freedom we are at liberty to take different ground, or free ourselves at all from the rules that guide us in respect to other questions of property. All I ask is that we may adhere to those rules. It is dear that the legislative will was in favour of suffering every man to exercise his benevolence, or satisfy his scruples of conscience, in respect to freeing his slaves, provided he resorted to the means pointed out by the law. This power we ought not to suppose that the legislature has dealt out grudgingly; nor ought we, when a man has resorted to the legislative means, to look with a jealous eye upon the proceeding, and hedge him round by rules and restrictions which we do not apply to other cases. The slave is his own property; the law gives him the right of emancipation ; and where he has intended honestly to exercise it without trenching upon the rights of others, we ought to extend to the instrument by which he attempted to effect his intentions, as much liberality, at least, as is shewn to others disposing of property. The slave, too, who is the subject of this intended bounty, ought to be considered, as ho surely is, a more helpless and impotent creature than infants or femes covert; for these last, though incapable to act themselves, have generally relatives, connexions and friends able and willing to help them. The law too has protected them by the defensive armour of *702 disability to injure themselves, or to be injured by the transactions of others. I repeat that I do not state these considerations, as the foundation of a claim to place the case of these parties on any higher ground than any other question of property. It is said, these slaves could not offer this deed for probat in court. Who then could ? The owner had gone into a court of record the day after the date of the deed, and acknowledged it in due form; but this happened not to be the proper court. The slaves had no guardian, no next friend, no human being whose duty it was, or on whom they had the shadow of a right to call, to bring the deed before the court: and without probat it was ineffectual to bestow freedom. If then they could not themselves even offer it for proof, the law was a dead letter, which offered them the boon of freedom, provided their master would execute a deed granting it, in the form prescribed. Here was a deed thus executed ; acknowledged too in a court of record by the master; and this acknowledgment considered a perfect compliance with the requisitions of the law, for twenty-one years. The imperfection was not discovered, indeed, by the very able counsel who argued the cause in the court of appeals; for in the first argument there is no such point made. It was suggested by the court, who called for an argument upon the point, and finally decided that the deed, not being acknowledged or proved in the proper county, was not so authenticated as to make it evidence on the trial, nor ought to be received as such evidence until it should be so proved or acknowledged. This was the first notice the parties had of the defect. The grantor was then dead, whereby the slaves lost all chance of having the deed again acknowledged : but they were still encouraged by the court with the idea that, though then imperfect, it would be effectual if they could get it proved by the witnesses. But how was this to be done, if they who were alone *703 interested could not offer it or bring it before the court . for proof? I think there are many cases in our books which go as far to assist slaves (especially those in which they are suffered to sue in equity) as is asked here; but I will not cite them, for I consider the point too clear, upon the reason and necessity of the case, to need any other support.
Secondly, was the proof offered sufficient to admit the deed to record ? The law requires two witnesses, and there weie two to this deed; but in the lapse of time, while all parties thought it had been duly perfected, one of the witnesses died, and the other had removed beyond the limits of the state. The general rule is, that if the attesting witnesses be dead, or blind, or insane, or infamous, or interested since the execution of the deed, or beyond the process of the court, or not to be found after diligent inquiry, their handwriting may be proved. This is laid down in many books. Gilliam’s adm’r v. Perkinson’s adm’r, 4 Rand. 325. 1 Starkie on Ev. 338. The proof in this case is the deposition of the absent witness (taken upon notice and cross examination) who, having the original deed before him, speaks fully to the execution of the deed by the grantor; with proof of the handwriting of the witness who is dead, of the deposing witness, and of the grantor. The question is, whether the general rule be applicable to the case of deeds offered for record to the court of pro-bat ? It is not confined to instruments of emancipation, but extends to other deeds; for the words “ proved in the county or corporation court by two witnesses, or acknowledged &c.” are used (or words equivalent) in relation to most if not all deeds; and it was upon the ground that secondary proof could not be received by the court of probat, in the case of any deed executed in Virginia, that the courts below refused the evidence offered in this case. I admit that I have known no case within my own experience, nor have I found any deci *704 sion upon the point in our books. Such decision I hardly expected to find; for though the probat of wills is often contested, I can recollect or find but one case where the probat of a deed has been opposed; and that one was not on the ground of defect of proof. In the absence of authority, we must follow the light of reason. The general rule admitting secondary evidence where a proper ground is laid, rests, I think, on sound reason and strong necessity. The party has acted with due caution, in taking witnesses to his instrument; but no effort of his can keep them alive, or prevent the accidents which may render them incapable or place them beyond his reach. He ought not then to suffer by these accidents; and therefore he may prove the handwriting of the attesting witnesses, in such cases. Do the reason and necessity apply to the case at bar ? Most emphatically, I think. In other cases, deeds are good between the parties without recording: but here it is of the essence of the deed, even between the parties. No stronger instance of this can be imagined, than this very case affords. All thought this deed perfected, for twenty-one years. There was then no laches during that time. Then this court pronounced that it was not admissible as evidence ; not because it had not been proved and recorded, but because this had not been done in the proper court. By this time the grantor was dead, and one witness also, and the other gone beyond the bounds of the state. Unless, then, secondary evidence be admitted, a party loses the benefit of his deed, without the smallest fault. I cannot assent to such a consequence. I conclude that the evidence offered was admissible ; and being so, there can be no doubt of its sufficiency. The refusal of the court to admit the deed to probat was defended in the argument, on another ground, to wit, that the death of the grantor had revoked the deed; and the case of Thrift v. Hannah &c. is quoted in support of the position. That point was *705 not before the court in that case; for there the feme married before the deed was recorded, and the court decided that such marriage avoided the deed. The effeet of her death upon the deed, could not be before the court, and was not decided by them. But I do not go upon that ground. I do not mean to touch the case of Thrift v. Hannah &c. But I mean to say that whatever might be the effect, in law, of the death of the grantor upon the deed, that was not a question for the court of probat. Their business was simply with the question whether the deed was sufficiently proved to admit it to record. Their office was ministerial solely. With no judicial question could they intermeddle. Their admission of the deed to probat could neither add to nor detract from its legal validity or effect. It was just as open to any objection on that score, after as before pro-bat. To the parties opposed to the deed, therefore, its probat could do no injury and offer no obstruction; while, to the claimants under it, such probat was of vital consequence. Without that, they could never, by any judicial proceeding, test its legal validity. In support of this view, I rely on the case of Dawson v. Thruston &c. 2 Hen. & Munf. 132. It is the only case I have met with as to the probat of a deed, and I consider it, both for the authority and the reasoning, conclusive. After pointing out in a clear manner the different functions of the county courts, and their inability to mingle the powers belonging to them in their different characters, judge Tucker says: “ So when a deed is offered to be proved, the court, quoad hoc, sits as a court of registry only. It is to examine the witnesses as to the execution of the deed, or to receive the acknowledgment &c. as a matter of right and duty. The contents of the deed, further than to know whether it ought to be proved by one, two, or three or more witnesses, in order to be admitted to record, are not a subject for their inquiry; much less the operation or effect of it. *706 Nor can they, when a deed is thus brought before them probat and recording only, avail themselves of their character as a judicial court, and refuse to admit the proof because by possibility the maker of the deed may have no right, as against other persons, to make such a deed.’* This is sound doctrine: and I add, if they could not even. look into the contents to judge of their effect, much less could they, in this ministerial proceeding, receive proof of extrinsic facts, and decide upon their effect in law upon the deed. Judge Roane says : “ Not knowing that the deed in this case is not justified by the act of 1782 respecting emancipation; and if not, believing that the recording of it will give it no additional validity, I am of opinion that it ought to have been recorded, to avail quantum, valere potest.” Shewing that the effect or 'validity of the deed ought not to be considered on a motion for probat. Judge Fleming agreed. The same Case is conclusive to shew that all the court considered a mandamus the proper remedy. The conclusion to which I have come in this case (to award a peremptory mandamus') is the more satisfactory, when 1 reflect that it cannot possibly injure the opposing party, while a contrary decision would shut out forever the claimants from a chance of having a judicial decision on the validity of their deed.
Cabell, J.
I am of opinion that the slaves named in the deed of Thomas Reynolds, and whom it was his ' intention to emancipate by that deed, had a right to present the said deed to the county court of Botetourt, and to tender proof of its execution, that it might be there recorded : that the said court, when thus called on, acted as a court of registry only, and had no right to inquire into the legal effect and operation of the deed, and to reject the proof thereof, on the ground of any supposed inefficacy of the deed, if proved and recorded : that the proof exhibited by the plaintiffs in error, *707 of the execution of the deed, was legal and sufficient for that purpose, and that the county court ought to have so declared it, and admitted the deed to record : that the county court having refused to do so, the plaintiffs in error were entitled to a mandamus, as their proper remedy. I am therefore of opinion to reverse both judgments, and to award a peremptory mandamus.
As the courts whose judgments we are reviewing had not, in my opinion, any right to inquire what would be the effect of the deed after it should be proved and recorded, I think it would be premature and extrajudicial in us to express, at this time, any opinion on that subject. I therefore decline to discuss the propriety of the decision in Thrift v. Hannah &c. and I do it the more readily, because that case is so different from this, that we may well question its application.
Tcoker, P.
In the examination of this case, one cannot but be struck with the fact that the benevolent intentions of Thomas Reynolds the former master of these paupers, have been frustrated for forty years by some technicality in the law. In October 1797 he executed a deed with all due solemnities for their emancipation, and on the next day acknowledged it as his act and deed in the district court, then in session at the Sweet Springs. In 1815 they instituted a suit for their freedom, in which a judgment was rendered against them, upon the ground that the instrument had not been proved and recorded in the proper court. They then proceeded to have the deed proved and recorded in Monroe in February 1821, and subsequently offered it for probat in 1830 to the county court of Botetourt, on the ground that at the time of the execution of the deed Reynolds resided in that county. The county court refused to admit the deed to record, because they deemed the evidence in support of it inadmissible and insufficient. From this sentence the paupers appealed. The *708 superiour court dismissed the appeal, but awarded a rule for a mandamus, to which a return being made, the rule was discharged by the superiour court; and from this judgment an appeal has been taken to this court.
It is now contended that the deed of emancipation has been revoked by the death of the grantor before it was recorded j that the paupers had no right to move that it should be admitted to record; that the evidence was inadmissible and incompetent; that the court had a right to judge of its suifficiency, and in the exercise of that judgment were not liable to a mandamus; and finally, that the reasons of the superiour court not being spread upon the record by exception, we must take it for granted that there may have been sufficient reason for the dismission of the rule. Let us examine these various objections.
As to the first, I am decidedly of opinion that the death of Reynolds the grantor did not revoke the deed of emancipation, and that it was competent to the paupers to proceed to have it recorded, for the purpose of perfecting their title to freedom. In maintaining this opinion, I shall not venture to call in question the decision of the majority of the court in Thrift v. Hannah &c. 2 Leigh 300. although I frankly confess that I should altogether have concurred in that case with the minority of the court; but in explaining my views of this case, it will be necessary that I should go into the examination of our legislation on the subject, and disclose my notions of its object, intention and effect, in the same manner as if that case never had been decided.
I shall not find it necessary to examine the question, whether “ the elevation of a slave from his degraded 'state to the rank of a freeman is one of those high acts of sovereignty which are only competent to the sovereign power itself.” Suffice it to say, that emancipation having been expressly prohibited in 1691 and 1723, by acts, the last of which continued in force till the passing of *709 the act of 1782, there can be no question that the powers of the master were incompetent to the emancipation of his slaves until that act, and that its provisions must be pursued, or the act of emancipation will be invalid. That act was passed at the close of the revolutionary war, when our councils were guided by some of our best and wisest men ; men who looked upon the existence of slavery among us not as a blessing but as a national misfortune, and whose benevolence taught them to consider the slave not as property only, but as a man. Declaring the expediency of permitting emancipation under certain restrictions, they proceed to the enactment of provisions, which distinctly evince that the caution and foresight of the lawgivers were not lost in the spirit of their philanthropy. By this act it was provided as follows: “ It shall be lawful for any person, by his or her last will and testament, or by any other instrument in writing under his or her hand and seal, attested and proved in the county or corporation court by two witnesses, or acknowledged by the party in the court of the county where he or she resides, to emancipate and set free his or her slaves or any of them, who shall thereupon be entirely and fully discharged from the performance of any contract entered into during servitude, and enjoy as full freedom as if they had been particularly named and freed by this act.” It next provides that “ slaves emancipated shall be liable for previous debts of the owner;” and then declares that “all slaves so set free, not being, in the judgment of the court, of sound mind and body, or being over 45 years of age, or not arrived at maturity, shall be supported by the master, and in defect thereof his estate shall be liable for their support.” It then adds a requisition that “ a copy of the instrument of emancipation, attested by the clerk, shall be delivered to the slave;” thus shewing clearly that it designed that the instrument should be : recorded. These provisions are all introduced into the *710 subsequent revisáis, and constitute the present law of the subject. From them it is abundantly evident, as has been decided in Givens &c. v. Manns, 6 Munf. 191. and Thrift v. Hannah &c. 2 Leigh 300. that an instrument of emancipation is ineffectual to confer freedom, till full probat thereof be made according to law. For the act of emancipation is, by this act, the joint act of the master through his deed, and of the government through its court. The state was deeply interested that the community should not be flooded with a population of paupers, sinking under the weight of years and a life of hardships and labour. It therefore inserted a requisition in the statute, that “all slaves so set free, not being, in the judgment of the court, of sound mind and body, or being over 45 years of age, or not arrived at maturity,” should be supported by the master. Hence it is necessary, and as far as my. observation has gone, it is the practice, in the case of emancipation by deed, to produce the slave in court for its inspection and examination. It is not, then, until the instrument has been proved in the county court, that the emancipation is complete. But so far as the master is concerned, from the moment it is executed and acknowledged before two witnesses, and delivered, it is final and complete. The master’s power over the act is gone forever, and he has no authority to revoke or cancel it.. The instrument, sealed and delivered by him before witnesses, requires no further act on his part, and is, as soon as recorded, to every intent and purpose a deed; and as such, its very name (factum) implies that it is done, finished, complete. It may indeed be avoided by matter ex post facto, as in the case of an escrow, or by matter of law, as in case of a bargain and sale not duly enrolled. But when sealed and delivered, it is forever beyond the power of the party. The analogy to an escrow, -which was pressed by judge Green in Thrift v. Hannah &c. appears to me to be apt and decisive.- Thus if a man *711 delivers a writing as an escrow, to be his deed on certain conditions, and afterwards he dies and the condition is performed, the deed is good, though it was not the deed of the party, even as between himself and the grantee, until the performance of the condition and second delivery, and only operates from the latter period. 13 Vin. Abr. 29. So if a feme sole deliver a deed as an escrow, and she marry before the condition be performed or the second delivery, the deed is good by relation. IS Vin. Abr. Relation. E. page 290. Observe, it is no deed in the intermediate time. It is but a writing, and so always spoken of. It is not even a contract, for nihil operator until the condition performed. If it did operate at all, it could only be as a deed ; for it is not a contract to do a thing, but it is the act itself in transitu, in its passage to completion, and so far perfected by the grantor, as to be placed forever beyond his power at least. So in the case of the deed of emancipation: call it, in the language of the statute, an instrument of writing under hand and seal; admit it, as supposed in Thrift v. Hannah &c. to be no deed until perfected by recording: still, like the escrow, which is no deed until the second delivery, it has the effect of concluding the rights of the grantor; it is an inchoate deed, and not a mere contract; it is in its passage to completion by proof before the court; when so proved, it is complete and effectual; and even before it is proved, it is beyond the power of the grantor.
The analogy of the escrow is however not so strong, I think, to the case at bar, as some others afforded by the law. Thus, as to a bargain and sale—By the statute 27 Hen. 8. ch. 16. it is declared that “ no lands &c. shall pass whereby an estate of inheritance &c. shall be made by reason of any bargain and sale, except by writing indented, sealed and enrolled &c.” The effect of the act is that no deed can enure to pass a freehold, unless it is recorded within six months, 2 Black. *712 Com. 338. and if a bargain and sale is not duly enrolled it is void. So here, if the deed of emancipation is never proved, it is ineffectual. But though a bargain and sale passes nothing until recorded, and though if not recorded it is void, has it no effect between its execution and delivery, and the time at which it should be enrolled ? Assuredly it has; for though the bargainor or bargainee die before enrolment, it may notwithstanding be enrolled, and the bargainee’s title is complete. 1 Bac. Abr. 688. If a man bargains and sells to one, and before the time of enrolment he sells to another, and then the first deed is enrolled, the first deed is good. Ibid. This shews that although the effect of the statute is that no title passes till enrolment, yet the execution of the writing so far concludes the grantor and terminates his powers over the subject, that he cannot revoke the instrument, even by the unequivocal act of conveying to another.
Another case of very strong analogy is to be found in 5 Co. 84. a. new edition, vol. 3.168. Ferryman's case. There was a custom found by special verdict, that feoffments or other alienations of freehold lands held of a certain manor, should be presented at the next court of the manor, and if not, that they should be void. The custom was pronounced good, though many objections were raised to it. Among other questions, it was asked, “Suppose the tenants will not present it; what is the remedy?” Subsequent cases have shewn that they may be compelled by mandamus. 1 Black. Rep. 60. 2 Strange 1113. It was also objected that “ once it was a feoffment, and that it would be against law to permit the custom to divest a freehold vested by solemn livery.” But it was resolved that the custom was good, and that if the feoffment was not presented according to it, the livery “ became void, because it wants presentment, which is part of the essence of the livery. And it was said that there is not plenum et perfectiom feoffamentum in *713 this case, till presentment made in court according to the custom; but it was opus inchoatum et non perfectum.” This decision is peculiarly strong and (I think) very apposite. It is peculiarly strong, because even the solemn act of livery is held to be suspended, in derogation of the general principle laid down by Blackstone, 2 Com. 166. that livery must operate immediately or not at all. Here then we have the most solemn conveyance known to the law, accompanied by the act of livery, which in its nature must operate immediately or not at all, suspended in its operation, looked upon as not plenum et perfectum, but as opus inchoatum et non perfectum. Is it extrava,gant to look upon the instrument of emancipation in the same light, with a view to give effect to the act of the parties, while we sustain the policy and obey the enactment of the statute ? I think not. The deed, like the feoffment, is ineffectual indeed till probat, but it is still opus inchoatum, though non perfectum.
But what further do we learn as to this feoffment,— this inchoate act,—this conveyance whose operation is suspended, and which is to become void if it be not presented at the manor court? Has it no effect in the meantime ? Is it revoked by the death either of feoffor or feoffee before the presentment ? Not at all; for if the feoffor or feoffee dies, and afterwards it is presented according to the custom, it is good. So in this case; though the instrument is not effectual until probat, the death of the grantor cannot affect it. It has been executed and delivered in the presence of two witnesses, with every solemnity necessary on his part. Nothing remained to be done by him. All that was yet to be done was to make the probat before the county court.
I am aware that the case at bar is attempted to be distinguished from the common law cases, on the ground that in them there was a grantee capable to take, but that here the slave is incapable to take at all, except by a perfected grant. Such a distinction I cannot recognize. *714 One would suppose that a slave, who is capable of nothing else, is at least capable to take his freedom, and that the grant of it is just as susceptible of gradations in its progress to perfection, as a bargain and sale of land, or a feoffment by the custom. We have seen that though the livery of land is both indivisible in its character and immediate in its operation, the law (to further the intent of the parties) considers it as concluding the powers of the feoffor, though it does not vest the title in the feoffee until the final act of presentment. Is it less reasonable or more difficult to conceive the same in relation to the slave ? Is there indeed any difficulty in saying that the deed of the master, delivered in the presence of witnesses, although ineffectual to give freedom until the probat, is effectual to conclude the master’s power over the act, and to give the right to freedom irrevocably, though its perfection be suspended until the deed shall be recorded ? Such a construction might be expected from a court, which has avowed the benign principle, that in a case of doubtful construction some weight is due to the spirit of the laws of all civilized nations in favour of liberty. Isaac v. West’s ex’or, 6 Rand. 652.
I do not rest, however, on these general principles. I found myself on the act of assembly, and the decisions of this court. , The act of assembly at least confers on the slave the capacity to receive his freedom. How is it to be conferred ? Among other modes, by an instrument in writing sealed and delivered in the presence of witnesses, to be afterwards proved in the county court. In this mode of conveyance, then, there may be a space or interval between the act of sealing and delivery, and the probat. In this interval, has the deed no effect at all, or has it a suspended effect, like the bargain and sale or feoffment ? If it has no effect at all, then what is to give it effect afterwards, and make it binding on the master ? There is no further step to be taken, but *715 the step on the part of the government through its courts—the probat of the deed—the examination of the freedmen with a view to their age, health and con- . dition—and their registry and description, that they may obtain free papers for their protection. Can this act of the county court hind the master, if he was not before bound; and if ho was bound, how can he revoke ? It is to me a novelty in our system of jurisprudence, to say that a man who solemnly seals and delivers a deed is not bound by it, and yet that the act of others afterwards binds him without any further act of his own. How much more reasonable the common law doctrine, that the deed does hind the party ; that it concludes his powers over the subject; that though opus inchoatum et non perfectum, it yet passes an incipient and imperfect right, the perfection of which no longer depends upon the party, but which may nevertheless be perfected or avoided by subsequent events.
But let us see whether wo have not ourselves repeatedly recognized in our decisions the existence of this inchoate, suspended, imperfect right to freedom, which requires some further act for its perfection. In all emancipations to take place in futuro, we have examples of persons held in abject slavery, in whom there is the existing germ of freedom, requiring time alone to mature it. Pleasants v. Pleasants, 2 Call 856. Nicholas v. Burruss, 4 Leigh 289. In other cases a slave has been deemed so far entitled to his freedom before it is consummate,'that he may sue in equity for its consummation. In Dempsey v. Lawrence, Gilm. 333. Dempsey having paid his master part of his value and given him security for the residue, was conveyed to the surety, on the condition, it would seem, that when indemnified he should emancipate him. The court obviously recognize his right, and his right to demand the execution of a deed by the representatives of Lawrence; and yet in this case we are called upon to refuse even the prohat of a deed which *716 has already been executed. In Patty v. Colin, 1 Hen. & Munf. 519. judge Roane observes, “ The spirit of the decisions of this court in relation to suits for freedom, while it neither abandons the rules of evidence nor the rules of law as applying to property, with a becoming liberality respects the merits of the claim, and the general imbecility of the claimants; and their claims are not repudiated as long as there is a possible chance that they ean meet with a successful issue.” And in that case, where a testatrix had emancipated her slaves by will, although their title to freedom depended upon the sufficiency of the other funds of the estate to pay its debts, yet they were held to have so far a title to their freedom, that they could maintain a suit in equity for the settlement of the estate accounts, and were entitled to be free after the debts were all paid. Nay more, though they were held liable to be sold if the estate proved insufficient, yet it was decreed they should be sold only for a term of years, if that would satisfy the demands against the estate, and during the term for which they might be sold, would be slaves only sub modo. Here we see an admission of a suspended right to freedom, and a laudable anxiety to sustain it, and to aid the paupers who were unable to help themselves. In Dunn v. Amey &c. 1 Leigh 465. the testator directed that his executor should emancipate his four slaves. He did not do it. A bill in chancery to compel him was sustained. The court considered the will itself as having conferred a right to freedom, but they deemed that matter unimportant, thus admitting that even if the deed of the executor was necessary, the slave had rights anteriour to such deed. Moreover they held that the estate accounts must be taken, and that the freedom of the paupers must hang suspended upon the result of them. In the case of Nicholas v. Burruss, I was myself of opinion that in an emancipation by will, the assent of the executor was essential to enable the pauper to *717 sue at law; in other words, to perfect his title to free- .... dom. The other judges waived an opinion on the point, and I shall only refer to my reasons in support of my own. Lastly, in Isaac v. West’s ex’or, 6 Rand. 652. a deed of emancipation, by which the master manumitted his slaves at his death, directing however that they should serve him as long as he lived, was construed as passing a present right to freedom; and children born of the emancipated females, after the execution of the deed but before his death, were held to be free. In this opinion the whole court concur. From these cases I think it is clear, that not only will an inchoate and imperfect right to freedom in a slave be recognized, but even a modified quasi state of freedom is sanctioned by this court; a state in which an emancipated female is held in unqualified slavery, yet is deemed capable of having freeborn issue; a state, therefore, in which the party is half free, half slave, with the mingled rights of each state, I presume, cast upon her.
Such are my views of the construction and effect of the act of emancipation. I yield, however, to the authority of Thrift v. Hannah &c. which certainly takes a very different view of the matter. But in doing so, I do not admit that it rules this case. Admitting that the deed is not complete before it is recorded, and that upon marriage it is to be considered as giving way to the marital rights of the husband, the question still recurs whether it is revoked by the death of the party merely. That the vesting of the marital rights should have the effect of vacating the yet imperfect title of the slave, is one thing : the supposed revocation by the mere death of the party, is assuredly a very different thing. The marriage of the feme before she had had the deed perfected by probat, may perhaps be looked upon as evincing her exercise of that power of revocation which it is admitted is recognized by the court; or the marital rights may have been considered as preferable to an *718 incomplete title to freedom in the pauper. But upon what ground the death of a party can be looked upon as a revocation, 1 am at a loss to determine. It cannot even be pretended to be any evidence of an intent to revoke. Nor does the death operate, per se, a revocation because the property passes into the hands of the executor; for it devolves on him as the testator left it to devolve, and it would be monstrous to say that where a testator retained, till his last breath, the anxious purpose to give effect to a previous deed of emancipation, that purpose should be defeated by his casual death before the session of the probat court. The testator having executed the deed and shewn no purpose to revoke it, what power can the executor have to defeat his wishes by a revocation, or by seizing the slaves and treating them as distributable estate ? Such a proposition appears to me too extravagant to be maintained. I am therefore of opinion that the instrument of emancipation ought to be admitted to record, if duly proved before the county court of Botetourt.
The next question is, whether the paupers were entitled to move the court to admit the paper to record. This question was made in the case of Winn v. Boll et al. 3 Leigh 140. but was not decided. I shall not enter into an enlarged discussion of it, but shall merely observe that if, as I have endeavoured to shew, the paupers have under the deed an inchoate but imperfect right, they must have a right to the necessary means of perfecting their title. The cases already cited conclusively shew that pauper suits for freedom may be prosecuted at law or in equity, according to the nature of the case. They shew that before emancipation by will is rendered effectual by the assent of the executor or the settlement of the affairs of the estate, the paupers will be admitted to enforce their rights in equity. In this case, they instituted their, suit for freedom many years ago, and produced in evidence their deed recorded *719 In the district court. They were told that that was i . . „ _ not the proper tribunal. They then proved it m Monroe; but that was also wrong, because it was not the county of Reynolds's residence. They have been told by the judgment of this court, that the deed of emancipation, not having been proved in the proper court, ought not to be received as evidence until it shall be proved or acknowledged before the proper court. They have accordingly gone to the proper court, to have it proved; and now we are called upon to tell them, they have no right to ask that the instrument of their liberation shall be proved as the law requires. I cannot unite in doing so. The act of assembly, in giving them capacity to receive their freedom, cannot have designed to withhold from them the right of proving the deed, without which it must continue ineffectual. On whom are they to rely to do them this justice ? On the persons who have an interest in holding them in slavery, and who have successfully resisted their efforts to obtain their freedom for so many years ? By no means. In giving them an interest in having the deed proved, the act of assembly gave them a right also to have it done : otherwise it would indeed “ keep the promise to the ear, and break it to the hope.”
Having already consumed so much time, I must shortly remark as to the other points, that I think the evidence was admissible and satisfactory; that the mandamus was the proper remedy in this case; and that it was improperly dismissed by the superiour court of law. I am therefore of opinion to reverse the judgment, and to award a peremptory mandamus, as the judgment which ought to have been given by that court.
Judgment of superiour court of Botetourt reversed, and peremptory mandamus to the county court awarded.