# WHEELING.

## DRYDEN v. SWINBURNE.

Submitted January 14, 1882.—Decided July 8, 1882.

*(SNYDER, JUDGE, Absent.)

1. A case being brought before a circuit court by a writ of *certiorari* for review, it should review not only jurisdictional questions and questions of irregularity in the proceedings of the inferior

*Case submitted before Judge S. took his seat on the bench.

12

tribunal also but all questions of law and all actions alleged to be based on erroneous principles or taken in the absence of all evidence to justify such action. (p. 107.)

2. It is therefore the duty of the inferior tribunal to make a part of its record, if asked by any party, all the facts necessary to enable the court to see, upon what principles of law it has based its action, or whether there was any evidence to justify its action. And all the rulings and decisions of all law questions in the case and all the facts necessary to the proper understanding of all such rulings and decisions of such inferior tribunal ; and if it refuses to do so, the circuit court may by *mandamus* compel it to perform this duty. (p. 110.)

3. This duty of the inferior tribunal is conveniently performed by signing, sealing and making a part of its record bills of exceptions in the usual manner ; and though not required by the statute to perform this duty by signing bills of exceptions, yet if it does so, such bills of exceptions will be regarded by the appellate court as parts of the record, as in other appellate proceedings. (p. 113.)

4. In a contest about an office before the county court or other inferior tribunal, the decision of such tribunal may be reviewed by the circuit court by a writ of *certiorari;* and the decision of the circuit court may be reviewed by the Supreme Court of Appeals by writ of error.  Sec. 15 W. Va. 234 and 483. (p. 105.)

5. The law requires, that an alien should be naturalized in a court of record, and his admission to citizenship must be a judgment of such court ; and therefore if it is claimed in any case, that an alien has been naturalized in a certain court, and it be shown, that if naturalized at all, he was naturalized in that court, and the records of such court are produced, and an examination of them shows, that no entry was made on the records of such court naturalizing such alien, it can not be proven by parol evidence, that he was admitted to citizenship in such court, but that by inadvertence or for any other reason there was no entry made of it ; nor can the citizenship of an alien under such circumstances be presumed by proof of his having held real estate or of his having voted or held office, or by other circumstances. (p. 121.)

6. By section 2172 of the Revised Statues of the United States if a father be naturalized, while the son is under the age of twenty-one years, and while the son is residing in the United States, the son will be considered a citizen of the United States ; but if at the time of the naturalization of the father the son is over twenty-one years of age, such son cannot be considered a citizen though the father was naturalized prior to the first day of December, 1873, when said Revised Statutes of the United States went into operation. (p. 128.)

7. No court has any power or authority in naturalizing an alien to declare in its order, that such alien shall be held to be a citizen from a time preceding the making of the order; and if it makes such declaration its act is unauthorized and void, so far as this declaration is concerned and he is a citizen only from the time when such order was made.   (p. 134.)

8. Chapter 7 section 5 of the Code of West Virginia declares, that any person holding office or expecting to hold any office, who sells the same or lets it to farm or contracts to do so, as well as the person, who buys the same or takes it to farm or contracts to do so, shall be thereby disabled from holding such office. The true meaning of this section is, that the parties are disabled from holding the term of office, the whole or any part of which was thus sold or contracted to be sold, whether this term of office be an existing one or a future term of office not then in existence; but it is only the term of office, for which the contract is made, that these parties are disabled from holding; and neither of said parties is rendered ineligible to hold such office at any future time, unless the contract is to sell or farm a future term of office in whole or in part, and then he is rendered ineligible to this office only for the term included in the contract. (p 136.)

9. If an alien and a citizen eligible to office are candidates for the same, and the alien receives a majority of the votes cast at the election, though such alien be declared ineligible to the office upon a contest between them, the citizen, who receives a minority of the votes cast, cannot be declared entitled to the office; but it must be held to be vacant.  (p. 137.)

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Kanawha, rendered on the 19th day of December, 1879, in a contested election case, wherein John Dryden was plaintiff, and Thomas Swinburne was defendant, allowed upon the petition of said Dryden.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the judgment complained of.

Green, Judge, furnishes the following statement of the case :

This case is a contest for the office of clerk of the circuit court of Kanawha.    The contest was first heard in the county court of Kanawha at the November term, 1878; and the court dismissed the case, which was instituted by John Dryden to contest the right of John Swinburne to hold this office, the dismissal being based on the ground, that the court had

no jurisdiction to hear the case and decide the controversy. The cause was then taken by *certiorari* to the circuit court of Kanawha county. It reversed the county court and proceeded to try, the case *de nova* and decided upon the evidence adduced before it, that Swinburne was an alien at the date of his election and could not hold the office. The case was then brought to this Court by a writ of error and *supersedeas ;* and the judgment of the circuit court, so far as it reversed the county court, was sustained; but so far as it undertook to hear the case *de nova* and decidé the same, it was reversed, and it was directed to remand the case to the county court of Kanawha for trial. These matters are all set out at large in the opinion rendered by this Court, in *Dryden* v. *Swinburne*, 15 W. Va. 234, to which reference is made for a full detail or the case and all the proceedings in it prior to its being remanded to the county court for trial. After it was remanded to the county court, it was again tried on its merits, and it was decided, that Swinburne was legally entitled to hold the office. This decision was rendered on the 12th day of September, 1879. The judge of the circuit court of Kanawha awarded a writ of error and *supersedeas* to this judgment. This court then awarded a writ of prohibition forbidding said circuit court to proceed further in this case on the writ of error, upon the ground that the granting of a writ of error and *supersedeas* in this case by the circuit court was an act done without authority, and that it could acquire jurisdiction in the case only by a writ of *certiorari*. These proceedings are set out at length in the case of *Swinburne* v. *Smith, Judge, &c.*, 15 West Va. 483.

The circuit court of Kanawha then awarded a writ of *certiorari* to bring into this Court the record in the proceedings in this case based on a notice to contest this election. The proceedings on this *certiorari* was commenced on Nov. 29th, 1879, when John Dryden presented his petition in said circuit court verified by affidavits praying for a writ of *certiorari* to bring into this Court the record of this case; and a rule was awarded him against Thomas Swinburne to show cause why this writ of *certiorari* should not be issued.

This petition alleged, that there was error in the judgment of the circuit court rendered on Sept. 12th, 1879, which deci-

ded, that at the time of the election, and when he received his certificate of election as the clerk of the circuit court of Kanawha, Thomas Swinburne was and still is a citizen of the United States of America and of the state of West Virginia, and entitled to vote in said state, and was eligible to be elected to and hold this office, and that he was duly elected to said office and was entitled to hold the same. As errors in said judgment this petition alleges, that it was clearly proven in the trial, that Swinburne at the time of the election was an alien and ineligible to hold this office; and that the record showed, the evidence, that he was such alien, was decisive, and there was in the trial of the case no contrary or conflicting evidence, as clearly appears on the face of the record; Swinburne appeared to this rule and moved to quash the same, which motion the court overruled; and thereupon Swinburne filed his answer to the rule supported by his affidavit, and it was by Dryden replied to generally.

This answer denies the allegations of the petition and asserts, that he was at the time of the election a citizen of this state, as the record in the case and the judgment of said court shows, and was duly elected to said office and legally entitled to hold the same; and it further asserts, that Dryden was not elected to this office, but that he was and still is disqualified from holding this office or being elected thereto, as the record would show; and therefore as the writ of *certiorari* is not a matter of right but purely a matter of discretion and can only be properly awarded to promote justice and right, he prays, that it may not be awarded. But the court awarded the writ as prayed for upon Dryden executing a bond with good security in the penalty of two hundred dollars before the clerk of said circuit court conditioned to pay all damages, costs and fees, which might be awarded against or incurred by him. The writ was accordingly issued; and the record of the case was sent up certified by the members of the county court under their hands and seals and also duly certified by the clerk of the said county court; and on December 19, 1879, the circuit court of Kanawha decided the case, entering the following order:

"This day came the parties by their attorneys, and the defendant Swinburne by his attorneys moved the court to quash

said writ of *certiorari*, which motion being argued by counsel and considered by the court is overruled. And thereupon the court having seen and inspected the record of the said judgment and proceedings of the county court, and having heard the case fully argued by counsel on both sides, the court is of opinion, that there is no error in said judgment and proceedings, which this court can review and correct. It is therefore considered that the said judgment be and the same is hereby affirmed, and that the defendant, Thomas Swinburne, recover against the plaintiff, Dryden, his costs about his defense in this behalf expended including ten dollars, as allowed by law."

The following is the substance of this record certified as the complete record in said county court:

The notice of Dryden to Swinburne to contest this election sworn to by Dryden was served October 18, 1878, returnable November 1, 1878, on which day it was dismissed by the county court for want of jurisdiction. On November 6, 1878, an order was made directing the record to be certified to the circuit court in obedience to the writ of *certorari* issued by it. On the return of the cause to the county court for trial on the 25th of August, 1879, the court overruled the demurrer of the contestee, Swinburne, to the notice; and he then tendered five special pleas, four of which the court rejected, but allowed one of them to be filed; and the plaintiff replied generally to it and gave the defendant a counter notice, that he would contest the election of Dryden to this office and his right to contest the election of the defendant Swinburne, because he Dryden was disqualified from holding the office under the provisions of chapter 7 section 5 of the Code of West Virginia by reason of the fact, that he Dryden had entered into a contract in writing with W. E. G. Gillison, who then had been elected and qualified to said office commencing on January 1, 1873, and had then entered on the duties of the same, to farm said office and did farm the same; and under said farming contract he received the first emoluments of this office up to January 1, 1879. Said notice also stated, that these facts had come to his knowledge since December 19, 1878. This notice was sworn to by Swinburne.

The plea, which he filed, was, that at the time of the election he was and for a long time had been a citizen of the United States and of West Virginia and entitled to vote in said State.

On the 12th day of September, 1879, the county court decided this contest entering up a judgment, that Swinburne's plea was sustained; that he was eligible to this office and was duly and legally elected thereto and was entitled to enter upon and perform the duties thereof for the term. It adjudged the costs against Dryden, which it found were eleven dollars and forty cents and ordered the president of the court to deliver to Swinburne a properly authenticated certificate thereof. This judgment was suspended on giving a certain bond and security for twenty days to afford Dryden opportunities to obtain a writ of error and *supersedeas.* It recited that John Dryden on the trial of the case had tendered two bills of exceptions, which were issued and sealed. The first of them sets out all the evidence in the case and the decision of the case, and the fact that Dryden excepted thereto. The second bill of exceptions states, that the court delivered a written opinion on the merits of the case, which the plaintiff asked to have incorporated in the judgment, which the court refused to do; and the plaintiff excepted to the refusal. The opinion set forth in full in this exception is as follows:

"The question before the court is simply this: Was Thomas Swinburne a citizen of the United States on the day of the election? In coming to a conclusion the court has been greatly assisted by the able argument of the counsel on each side. The defendant's counsel claim that Thomas Swinburne was a citizen of the United States on the day of the election—

"2. Because he was naturalized in the circuit court of Raleigh county on a day subsequent to the election, which court, by its order, dated his citizenship back to 1865.

"2. Because his father, Ralph Swinburne, was naturalized in the year 1856, and that Thomas then being under the age of twenty-one years, was naturalized by virtue of the first clause of section 2172, page 382, of the Revised Statutes of the United States (1873).

"3. Because his father, Ralph Swinburne, if not naturalized in 1856, was certainly naturalized in 1866, and that by

virtue of the last clause of the said section he became a citizen of the United States.

"As to the first, the naturalization was after the day of election, and the order of the court made him a citizen only from its date, so much thereof as attempted to date the naturalization back to 1865 being void.

"As to the second, there is no record of the proceedings, that naturalized Ralph Swinburne in 1856, and the question as to whether the naturalization of a person of foreign birth can be proved by evidence other than the record it is not necessary for the court to determine, since it does not seem to us that it is sufficiently proved that Ralph Swinburne was so naturalized in 1856. He says he took the oaths required by the law before Mr. Quarrier or the court, and remembers that Mr. Quarrier said to him that if any person questioned his being a citizen to send them to him; but this is no evidence of the examination of witnesses, the proof of residence, of character, of attachment to the government of the United States, of the judgment of the court, all of which are necessary to make a citizen of a foreign subject. There is much in the evidence going to show that Ralph Swinburne supposed he had become a citizen from about the year 1856, but not enough to prove the fact of such naturalization; but these circumstances do not amount to proof, particularly as he is here and might have furnished from his recollection the whole facts, including the names of the witnesses that proved his character, residence and attachment to the government and the judgment of the court.

"And as to the third, the proper construction to be given to the last clause of section 2172, page 382, of Revised Statutes of the United States, which reads as follows: 'And the children of persons who now are or have been citizens of the United States shall, though born out of the limits and jurisdiction of the United States, be considered as citizens thereof,' determines the question now before the court. This statute was first enacted in the year 1802. Its language seems to be retrospective. In 1873 Congress passed 'An act to revise and consolidate the statutes of the United States in force on the first day of December, *Anno Domini* 1873,' and the first clause of section 5596, page 1091, Revised

Statutes of the United States, reads as follows : 'All acts of Congress passed prior to said first day of December, 1873, any portion of which is embraced in any section of said revision, are hereby repealed, and the section applicable thereto shall be in force in lieu thereof.'

"Now, on the one hand it is contended that the Revised Statutes of the United States is only a compilation of the laws, and on the other that the book is a Code in which the laws have been re-enacted and not merely compiled. If the Revised Statutes is merely a compilation of the acts of Congress in force on the 1st of December, 1873, the last clause of section 2172, Revised Statutes would be construed as speaking from 1802, and could be of no use to Thomas Swinburne; but if the Revised Statutes of the United States is a Code containing only laws that were enacted in 1873, and that all acts of Congress of a general nature passed before 1873 were repealed, then the last clause of section 2172, Revised Statutes, would speak as of the 1st day of December, 1873, and as Ralph Swinburne was naturalized in pursuance of the act of Congress, in a court of record in 1866, and as Thomas Swinburne is his child, by virtue of the last clause of section 2172 Revised Statutes, he would be a citizen of the United States since the 1st day of December, 1873. After the most careful consideration, this court is of opinion that all acts of Congress passed prior to the first day of December, 1873, any portion of which is embraced in any section of the Revised Statutes were thereby repealed, and the section applicable thereto has since then been in force in lieu thereof. A portion of the naturalization act of 1802 is embraced in the Revised Statutes. This part is now the law, and the old act is now repealed. The naturalization law then speaks as of 1873, and the last clause of section 2172 is broad enough to include Thomas Swinburne, who is a child of Ralph Swinburne, who was a citizen of the United States in 1873.

"This court is, therefore, of the opinion that Thomas Swinburne was a citizen of the United States on the election day at which he was elected clerk of the circuit court of this county, and consequently was a voter under the laws of this State, and as such entitled under the laws of the State to the office to which the people have elected him."

The facts proven at the trial, as set out in the first bill of exceptions, are, that Thomas Swinburne was born in England in 1840, both his parents being natives of England British subjects and residents; that they emigrated in 1851 with their infant child Thomas Swinburne, the defendant, to the United States and settled in Kanawha county, then in the State of Virginia. The father, Ralph Swinburne, was naturalized in 1866, his son Thomas Swinburne, the defendant, being then twenty-six years of age. At the election held regularly on October 8, 1878, for the office of clerk of the circuit court of Kanawha county the defendant, Thomas Swinburne, received 2182 votes, the plaintiff John Dryden 2103 votes, and one J. W. Parish 1116 votes. A certificate of election was regularly issued to Thomas Swinburne; and he qualified as such clerk regularly on November 1, 1878, and gave his bond in the penalty of five thousand dollars with approved security before the county court of Kanawha. His term of service was for six years from January 1, 1879. It was proved, that this office was worth more than one hundred dollars. It was proved by the contestant, Dryden, that the record-books of the county court of Kanawha were all indexed. It was the practice to do so; but on reflection he states, that he had been shown some records, which were not indexed, but he states, that if Thomas Swinburne was admitted to citizenship in 1855, as claimed, in that court, it could not take over an hour to examine the records and ascertain the fact; that memorandums were made on a minute book each day and formally drawn up the same day.

It was proven by him, that blank forms of naturalization papers and oaths were kept; that he was acting as clerk, being a deputy clerk; and that most of the orders were entered by him; that most of the naturalization oaths had been administered by him as deputy clerk of the circuit court for years prior to and after 1856; and that he knew of no naturalization orders, which had been omitted to be entered of record. Witnesses differed as to the time, it would take to thoroughly search the order-books and ascertain, whether a particular person was naturalized in 1856 or 1857; they vary in their estimate of the necessary time from an hour to a week; but it was proven, that these record-books both of the county court and

circuit court of Kanawha, had been thoroughly searched, and that no order could be found prior to 1866 naturalizing Ralph Swinburne, the father of Thomas Swinburn.e   All the record-books of both these counties are in existence, none of them having been lost.   The names of both Ralph Swinburne and Thomas Swinburne appear on the books of the registrar of Kanawha county as voters from 1866 to 1870 inclusive.

It is entered on these registrar-books, that both of these persons were born in England; that Thomas Swinburne was twenty-six years old in 1866; that he had resided in the State eleven years and came to the United States when eleven years old; and that his father, Ralph Swinburne, was naturalized on May 14, 1866.   A deed was produced dated November 21, 1855, and recorded on that day, whereby there was conveyed to Ralph Swinburne one hundred and eighty-six acres of land in Kanawha county; and it was proven, that after this farm was bought in 1855, Ralph Swinburne and his family including his son Thomas Swinburne had lived upon it except during the whole of the late war, in which Thomas was a soldier in the armies of the United States, was wounded and received a pension from the government.   He enlisted September 5, 1861, and was honorably discharged January 24, 1865.   After the war he was registered as a voter and voted regularly, though the entries made on the registrar's books, as stated above, on their face showed, that he was an alien and not entitled to vote, as they showed, that his father was naturalized after he Thomas was twenty-one years of age.

Ralph Swinburne testified, that he made his declaration of an intention to become a citizen in the circuit court of Kanawha December 7, 1852.   A copy of it from the order book of that court was produced; and it was in the usual form.   He also testified, that in 1856 or 1857, he thinks it was in 1856, he took before the circuit court of Kanawha, the clerk or the court administering, the oath usually administered to aliens, when naturalized.   He gives in his testimony the words of the oath, which he took.   He further testified, that the clerk told him, that he had not time then to write his papers, but he would do so, as soon as he got leisure; and if any one disputed his having taken the oath, to send him to the

clerk's office; but having no use for them he never called for his naturalization papers. After this he always voted and took an active part in elections, no one ever disputing his right to vote. In 1858 as a Baptist preacher he obtained from the county court of Kanawha county testimonials, whereby he was authorized to perform the rites of matrimony; and he produced a copy of the order of the county court of Kanawha conferring on him this right of marrying persons. It was dated March 15, 1859, and shows, that he took then an oath of allegiance to the commonwealth of Virginia. He states, that during the war he was arrested by a Confederate officer and required to leave the State, unless he would take an oath of allegiance to the Confederate States. He objected to so doing, because he could not conscientiously do so, as he had taken an oath of allegiance to the United States— but being liberated for a time, and his friends advising him to take the oath, on his return to the Confederate officer he concluded to do so; but the officer did not require him to do so, and he did not take this oath. Another witness proves, that at that time he heard him say, that he could not conscientiously take an oath to support the Confederate States, as he had taken an oath of allegiance to the United States. A copy of an order naturalizing Ralph Swinburne in the circuit court of Kanawha dated June 5, 1866, was produced. He explains this as follows: He says, that in 1866 he applied to the registrar to be registered as a voter. The registrar asked him for his naturalization papers and was told, that he did not have them, but they were in the clerk's office. The registrar told him afterwards that he could not find the naturalization papers in the clerk's office and advised him to take the oath and take out his naturalization papers again, which he did.

Thomas Swinburne was elected in 1866 clerk of Washington township in Kanawha county and a supervisor of the county in 1871–1872, was appointed as inspector of elections in 1877 and also as road-commissioner; and he had served at least two terms as township clerk, and was appointed a registrar in 1868 or 1869; that he took the oaths of office, when he entered on the duties of these several offices, and his right to hold them was never challenged or dis-

puted.   An effort was made to prove, that a copy of these naturalization papers claimed to have been issued to Ralph Swinburne in 1856 had been seen in a file in the clerk's office, in which naturalization papers were kept; and one witness says, that at one time, he can not say when, but he thinks it was before 1866, though in this he might be mistaken, in handling this bunch of papers he saw papers endorsed with Ralph Swinburne's name; it might have been only his declaration made in 1852, which would be kept in same bundle, if there had been no contest, but he would have thought he saw endorsed both the declaration and naturalization-order, two papers, only saw their backs; but he may be mistaken in thinking he saw more than one paper.   But this file of papers was after this evidence found; and in it was no copy of any naturalization papers of Ralph Swinburne in 1856 but only a copy of his declaration in 1852 and his final papers or order of naturalization in 1866, one wrapped up in the other.

After this contest for this office had been commenced in the county court, Thomas Swinburne in Raleigh county, on November 9, 1878, was regularly naturalized by an order of the circuit court of that county.   This order closes thus: "It is considered by the court, that said Thomas Swinburne be declared a citizen of the United States from the date of his discharge from the service of the United States and to be entitled to all the privileges thereof."

It was also proven, that Thomas Swinburne had been certified properly by the proper commissioner as elected clerk of the circuit court of Kanawha, and that on November 15, 1879, he was duly qualified before the county court of Kanawha and that by a written contract dated May 5, 1878; that W. E. G. Gillison, who then held the office of clerk of the circuit court of Kanawha for the term ending January 1, 1879, sold out his office for his term to the plaintiff, John Dryden, who qualified as his deputy and under this contract took complete possession of the office doing all its duties and took all the fees of office under this contract; that John Dryden agreed to pay for the office of Gillison fifty dollars per month.   This was the substance of all the evidence in the case.   There were various statements about the difficulties

of finding a lost paper or memorandum in the clerk's office but no proof, that any naturalization papers of Ralph Swinburne had been made out on loose memorandum, much less that any such memorandum had been lost.

To the order of the circuit court made December 19, 1879, affirming the judgment of the county court, that Thomas Swinburne was eligible to the office of clerk of the circuit court of Kanawha, an appeal and *supersedeas* has been granted.

*W. A. Quarrier* and *Smith & Knight* for plaintiff in error cited the following authorities : 12 Am. and Dec. 532, note and cases cited : 9 Am. Rep. 591 and cases cited; Rev. Stat. U. S. § 2172; Rev. Stat. App. pp. 1089, 1093; 2 Cranch. 139 ; 12 Seg. Inst. 140 ; Bright. Dig. 34 note (a.).

*E. W. Wilson* for defendant in error cited the following authorities; 4 Min. Inst. 728, 729, 742, 747, 854–856 ; Acts 1872–3, ch. 206; 1 Abb. U. S. Prac. 337, 338; 2 Wheat. 132, 141, 142; 15 W. Va. 234, 483 ; 1 Va. Cas. 264; Const. (1872) Art. VIII. § 28; Acts 1872–3, ch. 118, §§ 30, 31, 32; Const. (1863) Art. VI. § 6; 10 W. Va. 180, 185, 186; *Id.* 115 ; Lead. Cas. on Elections, 144, 146, 150; Dill. Mun. Corp. § 135; Cool. Con. Lim. 619, 620 ; Const. (1872) Art. IV. § 6 ; Rev. Stat. U. S. (2d ed.) § 2165 ; Dec. Ind.; 1 Min. Inst. 138 ; 16 Wend. 625; Const. Art. II. § 5 ; 4 Rand. 585 ; 10 Rich. (S. C.) Eq. 38 ; 6 Cranch. 182; 7 Wheat. 536 ; 1 Rand. 102 ; Const. U. S. Art. I. § 8, clause 4; 2 Dall. 372 ; 2 Wheat. 259 ; 5 Wheat. 1; 12 Wheat. 277 ; 7 How. 556 ; 19 How. 393 ; U. S. Rev. Stat. p. 1 ; *Id.* § 5596 ; *Id.* appendix p. 1089, §§ 1, 2, 3.

*J. H. & J. F. Brown* for defendant in error :

1. Tested by the pleadings, as it must be, the judgment is right.

2. No bill of exceptions setting forth the evidence was allowed at common law, and none has been allowed by our statute in a case of *certiorari* to a statutory proceeding in the county court.

3. If the evidence set forth in the bill of exceptions could be looked into, the court on *certiorari,* as in this case, could

not review it on the facts, or reverse the conclusions drawn by the special tribunal from those facts or conflict of evidence.

4. The evidence warrants the finding.

5. The declaration of intention, under the act of Congress, to become a citizen, confers an incipient right of citizenship, which, when perfected by taking the final oath, relates back to the beginning.

6. Naturalization is a fact which may be proved by time and circumstances which raise reasonable presumption or conclusion from them, just as any other fact may be proved, and a record of such fact of naturalization, or oath, may, in like manner, be proved by facts which raise a like presumption or conclusion.

7. The recorded acts of the proper officers in the discharge of their public duties are records, having the force and effect of judgments *pro tanto*; are *prima facie* right, and cannot be questioned collaterally, and include every fact indispensable to authorize them.

8. The act of Congress of 1873 naturalized the children of all persons who were then citizens, though born out of the United States, and meets the case of the defendant.

Code ch. 79 § 2; Ror. Jud. Sales § 306; 10 Pet. 449, 476, 477; 6 Leigh 595; 2 Lom. Ex. 132; 14 Gratt. 243; 1 Tuck. Com. 284; Ror. Jud. Sales § 127; *Id.* § 122; 10 Leigh 317; Jac. & Walk. 617; 6 Gratt. 107; 8 E. C. L. 274; 5 Rob. Pr.; 14 Gratt. 36; 17 Gratt. 490; 6 Cranch. 176; 16 Wend. 625; 4 Rand. 585; 7 Wheat. 535; Code Ch. 3 §§ 22, 27, 28, 29, 31, 34, 35, 37; 11 Leigh 338; 13 How. 183; 66 N. Y. 391; 6 W. Va. 408; 9 Gratt. 323; 6 Gratt. 118; 39 Cal. 427; 77 Ill. 644; U. S. Rev. Stat. § 2166; 12 Am. Rep. 532; 30 N. Y. 27; 69 N. Y. 411; Rev. Stat. U. S. § 2172; 17 Pick. 70; Rev. Stat. U. S. § 5596; 6 Cranch 176.

GREEN, JUDGE, announced the opinion of the Court.

The first question presented by this record is: Did the circuit court of Kanawha have jurisdiction in this case? It is argued by the counsel for the defendant, that the judgment of the county court in a case of this description is final and not subject to review in any forum. Article VIII. § 28 of the

Constitution of 1872 provides, that the county court in all contested election cases shall "judge of the election qualifications and returns of its own members, and of all county and district officers." But section 12 of this article provides, that "the circuit courts shall have the supervision and control of all proceedings before the county courts and other inferior tribunals by *mandamus* prohibition or *certiorari*." Acts of 1872, p. 27. This supervision in an election case can only be exercised by a writ of *certiorari*, no writ of error or *supersedeas* lying in such case. See *Dryden* v. *Swinburne* 15 W. Va. 234 and *Swinburne* v. *Smith and Dryden* 15 W. Va. 483. But it is argued, that the provision of the Constitution of 1872 does not authorize the reversal of an erroneous decision of a county court in such a case, though it is admitted, that it could have been done, under sec. 6 of article VI. of the Constitution of 1863. See Code of W. Va. p. 30. The only difference between the wording of these Constitutions is, that the Constitution of 1863 says: "The circuit courts shall have the supervision and *control* of all proceedings before justices and other inferior tribunals by *mandamus*, prohibition and *certiorari*." In the Constitution of 1872 the word *control* is omitted. It was, I presume, omitted, simply because it was included in the word supervision, which was retained and used. How the circuit court could supervise the proceedings of the county court, if it could not reverse them, if found erroneous, it is difficult to conceive. It would be an idle thing to give to the circuit court a power simply to inspect the proceedings of these inferior courts, which is all the power, that, the counsel supposes, was intended to be conferred by this power of supervision. But it seems to me to be absurd thus to restrict the meaning of this word. The power to control these inferior tribunals existed in the circuit courts under the Constitution of 1872 to the full extent, that it existed in them under the Constitution of 1863.

But this is no open question. It was decided by this Court in this case, when it was formerly before this Court. See 15, W. Va. 235. This case was then before this court on a writ of error to a judgment of the circuit court of Kanawha on a *certiorari* bringing the proceedings in the case before the

county court into the circuit court for review; and though this court reversed the judgment of the circtit court, it did not do so, because the circuit court had not the right to review the case by *certiorari*. On the contrary the right of the circuit court to review and reverse the county court and enter up such judgment as the county court should have entered up, was expressly then recognized, which recognition settles beyond controversy the jurisdiction of the circuit court in this case.

But it is insisted, that upon this *certiorari* the circuit court could only review the county court upon a jurisdictional question, that is, if the county court had exceeded its jurisdiction and pronounced a judgment, that it had no authority to pronounce, then and then only could its judgment be in this manner reviewed and reversed by the circuit court. This question also was substantially decided in this Court in 15 W. Va. 234; for this Court held, that the county court had jurisdiction in this case, and ordered, that the case should be remanded to it for trial. If we had thought, that this trial would necessarily and finally determine the case, simply because the county court had jurisdition to try the case, we would certainly have said so, as it would have put an end to this litigation, as soon as the case was decided by the county court. The failure of this court to intimate such a view is strong evidence, that we entertained no such opinion. There was however in the case, as thus presented, no propriety in our defining accurately the extent, to which a circuit court could review and correct errors in a judgment of a county court by a writ of *certiorari*. This we must now do, as this case is now presented to us.

According to the English practice a writ of *certiorari* might issue as well before as after the decision of the case in the inferior court, and when sustained, the superior court commenced *de novo* and tried the case in the superior court without regard to what had been done in the inferior court. Thus the relief granted was in England much more comprehensive than the relief granted on a writ of error, which was confined to the correction of those errors of law, which entered into and tainted the proceedings in the inferior court. We decided in this case, when formerly before us, in 15 West

Va., p. 235, that this English practice was not the practice in this State and ought not to be followed; and, though not then decided, the inference to be drawn from the views then expressed by this court was, that the practice in this State should be in cases brought before a superior tribunal by writ of *certiorari* for the correction of errors in a final decision of an inferior tribunal similar to the practice, when cases were brought before a superior court by writ of error. We expressly decided, that the judgment in the superior court, when the inferior court was rendered, should be alike; that is, in both cases, the superior court in such reversal should enter up such judgment, as the inferior court should have entered up, and when necessary, remand the case to the inferior court for further proceedings. The errors, which in this State are corrected on a writ of error, are generally errors of law; and the juries and inferior tribunals are as a general rule held to be the sole judges of the weight of evidence, and their decisions on an issue of fact is rarely reversed or interfered with by the Appellate Court on a writ of error. It is true, that the power in this State exists to grant a new trial on a writ of error, because the verdict is so contrary to the weight of evidence as to shock the conscience; and the Appellate Court in this State probably exercises this power thus, as it were, in a qualified manner to review, what seems to be a question of fact to an extent, to which it would not be exercised in some States. These States or some at least of them never reviewing a question of fact on a writ of error.

Bearing in mind this diversity of practice in the different States we may, I think, deduce from the decisions in *certiorari* cases, that the Appellate Court in cases brought before them by *certiorari* may review and correct the errors of the inferior court, not only when these errors are errors on questions of jurisdiction, power and authority of the inferior tribunal or on questions of the regularity of their proceedings, but also when there were any errors of law in their proceedings or any action taken by them on erroneous principles or in the absence of all evidence to justify it. In short the Appellate Court may review and correct any error of the inferior court, when the case after its final decision is brought before it by writ of *certiorari*, whenever the error is of

such a character, as that the Appellate Court would review and correct a similar error, were the case brought before it by writ of error. To sustain this position we may refer to the following among many other cases: *Starr et als.* v. *Trustees, &c.*, 6 Wend. 564; *Baldwin* v. *Calkins*, 10 Wend. 167; *State* v. *Mayor*, 32 N. J. L. 367 (3d Vroom.); *Graecen* v. *Allen*, 14 N. J. L. 74 (2 J. S. Green); *Hayward, Petitioner, &c.*, 10 Pick. 358; *Nightingale, Petitioner, &c.*, 11 Pick. 168; *Farmingto River Water Power Co.* v. *County Commissioners*, 112 Mass. 206; *Hyde* v. *Nelson*, 11 Mich. 357; *De Rochebrune* v. *Southeimer*, 12 Minn. 78; *Frankfort* v. *County Commissioners*, 40 Me. 391; *Lapan* v. *County Commissioners*, 65 Me. 160; *People* v. *Board of Police*, 69 N. Y. 411; *People* v. *Smith*, 45 N. Y. 776; *City of St. Paul* v. *Marvin*, 16 Minn. 104; *The Minn. C. R. R. Co.* v. *McNamara*, 13 Minn. 509.

It is true there are some decisions, that upon *certiorari* to an inferior court the Appellate Court will only enquire into errors or defects, which go to the jurisdiction of the court below. See *Hauser* v. *The State*, 33 Wis. 680. But even in Wisconsin, if there be no remedy by appeal, the courts will consider other than jurisdictional questions, *Milwaukee Iron Co.* v. *Schubel*, 29 Wis. 444; and it is very generally elsewhere held, that when there is any other available redress, a *certiorari* will not issue even to correct errors in the exercise of jurisdiction. In New York at one time it was held, that the office of the writ of *certiorari* was only to bring up jurisdictional errors. See *People* v. *Commissioners of Highways*, 30 N. Y. 72. But it may be regarded probably as settled now in New York, though their decisions have been very contradictory, that when there is no other available remedy, any law question may be considered and corrected on *certioraris*, though it be not jurisdictional in its character. *People* v. *Assessors*, 40 N. Y. 154; *People* v. *Supervisors, &c.*, 51 N. Y. 442; *People* v. *Allen*, 52 N. Y. 538.

Upon a review of the authorities I conclude, that a writ of *certiorari* issued by a superior court after final judgment of the inferior court brings up for review and correction not only errors and defects, which affect the jurisdiction of the inferior tribunal, but all errors of law in the record including all action taken on evidence before it and on erroneous prin-

ciples or any action taken by it in the absence of all evidence to justify such action.  This conclusion is sustained both by reason and the overwhelming weight of authority.  It seems to me absolutely necessary, that the principle stated should be acted upon, if we would not render of but little value a common law writ, which was designed to afford redress, when wrongs were committed by inferior courts from want of a correct knowledge of legal principles, and when the common law furnished no other mode of redress.  As it is, when there are errors in the record of the case, which are to be corrected, it becomes necessary to determine in case brought up by *certiorari* for review, what constitutes the record, and especially do bills of exceptions, which have been signed, sealed and made a part of the record, constitute a part of it, so as to authorize the superior court to look at them.

It is insisted by the counsel for the defendant, that they do not.  To support this position, they urge, that at common law no writ of error lay for an error in law not appearing upon the face of the record; and therefore when a party alleged anything *ore tenus*, which was overruled by the judge, this could not be assigned for error, and so the party was without remedy.  The law was amended in this respect by the Statute of Westminster 2 (13 Ed. I. ch. 31), which provided, that " when one impleaded before any of the justices alleges an exception, praying they will allow it, and if they will not, and he, that alleges the exception, writes the same, and requires the justices will put to their seals, the justices shall so do; and if one will not, another shall; and if upon complaint made of the justices the king cause the record to come before him, and the exception be not found in the roll, and the plaintiff show the written exception with the seal of the justices thereto put, the justice shall be commanded to appear at a certain day, either to confess or deny his seal, and if he cannot deny his seal, they shall proceed to judgment according to the exception, as it ought to be allowed or disallowed." 1 Bac. Ab. Bill of Exceptions 22 Inst. 426 ; opinion of Baldwin, judge, in *Taliaferro* v. *Franklin,* 1 Gratt. 340.

Under this statute the practice was, upon the return of the writ of error the judge was summoned by a writ to appear

personally and to confess or deny his seal.  If he confessed it, the proper entry was made, and it became then a part of the record.  In *Money, Watson & Blackmore* v. *Dryden Leach,* 3 Burrows 1693 a minute account is given of the manner, in which this statute was carried out; and as it is a rather amusing exhibition of the formalities of that day, I give an extract from the report.  After setting forth this writ at length the report proceeds.  "The Lord Chief Justice Pratt having now come into the court, pursuant to the command contained in said writ, delivered it to the Lord Chief Justice of this court.  Mr. Owen at the same time delivering the original bill of exceptions into Lord Mansfield's hands. Whereupon Lord Mansfield, showing to the Lord Chief Justice Pratt the seal thereunto affixed asked him, whether that was his lordship's seal or not, to which question his lordship answering in the affirmative, Lord Mansfield redelivered the bill of exceptions to Mr. Owen, at the same time delivering to him the above mentioned writ with orders, that it should be filed.  The lord chief justice of the common pleas immediately retired without sitting down; and the lord chief justice of this court attended him, till he was got past the puisne judge but not quite to the door of the court."

In Virginia and in this State under our statutes the judge below, when he seals the bill of exceptions, directs it to be made a part of the record, and it is copied with the balance of the record, when the case is taken to an appellate court.

In re-enacting this statute of 2 Westminster in Virginia there were some changes in its phraseology and one change was, that our act, read as follows:  "When one impleaded before any court, *and in any court, where appeal, writ of error or supersedeous lies* to the higher court, doth allege an exception praying, &c."  The words in italics were added in the Virginia law.  See 1 R. C. of 1819 p. 523 § 1.  The language of this statute has been since changed; but both in Virginia and in this State those italicised words remain in the statute. See Acts of 1872–3, ch. 206 p. 594.  In *Peter Case's case,* 1 Va. Cas. 265, it was decided, that, as the law then was in Virginia, a county court was not obliged to sign a bill of exceptions in any criminal case; and therefore, though they sign some in such a case, it did not thereby become a part of

the record. The defendant's counsel insists, that as our stat-
ute requiring bills of exceptions to be signed confines the
cases, in which they are to be signed, to cases, in which an
appeal, writ of error or *supersedeas* lies, a county court is not
required to sign a bill of exceptions in a case like the one
before this Court, in which no appeal, writ of error or *super-
sedeas* lies, but only a writ of *certiorari;* and therefore the bill
of exceptions signed by the justices of the county court in
this case is no part of the record and cannot be looked at by
this Court.

Is this position sound? If it be true, the provision giving
to the circuit court the power to supervise the proceedings of
the county court in election-cases will be almost nugatory.
The county court has unquestionable jurisdiction to try such
cases; but if nothing is to be regarded as a part of the record
of the case, except what they think proper to put upon their
record-book, and they are at liberty to decline to state on
their record-book any of the facts or any of their rulings
during the trial of the case, but may simply state on their
record-book, that the case was tried on the evidence sub-
mitted and decided in favor of or against a certain party, it
is obvious, that in effect there can be no review of their
proceedings; as however erroneously they may have decided
the law questions involved in this case, their errors could not
be corrected, as they would not appear on the face of their
record, as they have chosen to make it up.

If this be the law then it is assuredly in a very defective
state. But I apprehend this is not the law. If, as we have
seen, it is the duty of the circuit court to supervise by writ
of *certiorari* the proceedings of a county court in an election-
case and to review the decision of all law questions, which
were involved in the case, then it would be obviously the
duty of the county court to put upon its record, when requested
by any party to the contest, all its rulings on law-ques-
tions arising during the trial of the case and such facts
proven before it, as are necessary to the understanding of
such rulings on the law-points involved. For if they did not
do this, it would be impossible for the circuit court to per-
form its duty and superintend and review these rulings on
these law-questions. And if they refuse to perform their

duty in this respect with a view of defeating the jurisdiction of the circuit court in reveiwing their decisions on all law points in the case, the circuit court would have the power, and it would be its duty, by the common law writ of *mandamus* to compel them to make the entries on their record necessary and proper to show their rulings on these law points.

No statute-law was necessary to confer this power on the circuit courts especially when the statute-law, Acts of 1872–3 ch. 15 § 3 p. 43 and the Constitution ot 1872 article VIII. § 12 p. 27 conferred on the circuit courts the power to supervise all proceedings before the county courts by *mandamus*, it at once called into existence the power conferred by the common law to enforce, when appropriate, the performance of such a duty by the county court by *mandamus*. The authoritities sustain these views. In a large number of cases the reports show, that points of law arising in the trial of causes in inferior tribunals as well as the facts, which gave rise to these points, have been considered in the appellate courts, when cases have been brought before them by writs of *certiorari;* and these points of law have been reviewed, and they and the facts treated by the appellate court as a part of the record; but as no controversy with reference to this being a part of the record were raised. the cases generally do not show, how they were made parts of the record. See among many other the following cases: *State* v. *Elvins Col:* 32 N. J. 362 (3d Vroom.); *De Rochebrune* v. *Southeimer*, 12 Minn. 78; *Graecon* v. *Allen*, 14 N. J. 74 (2 J. S. Green); *Nightingale Petitioner, &c.*, 11 Pick. 168; *Hyde* v. *Nelson*, 11 Mich. 354; *The People* v. *Assessors of Albany*, 40 N. Y. 154.

But in the case of the *Minnesota Rail Road Co.* v. *McNamara*, 13 Minn. 508 objection was made in a *certiorari* case to the consideration by the court of questions of law, which appeared only by bills of exceptions, which had been sealed by the inferior court. The principle objection urged was, that they reviewed questions other than jurisdictional questions and they only considered and reviewed on a writ of *certiorari;* but the court held, that the rulings of inferior courts upon the admission or rejection of testimony, the instructions given and referred to the jury, with the exceptions taken together with so much of the evidence, as may be proper to show the

bearing of such rulings and instructions, may be brought before the superior court for reviewal; and that the bill of exceptions showing these facts and points might be considered by the superior court. The case shows, that there is no statute-law in Minnesota which specially authorizes bills of exceptions to be taken and directed thus to be sealed, when the cases can be taken up by *certiorari*.

In the case of the *Commonwealth* v. *Walker jun.* 4 Mass. 556, was the proceedings before a justice of the peace, wherein Walker was found guilty of neglect of military duty in not attending a muster. Though there was no provision of statute-law allowing bills of exceptions to be taken in such a case, yet bills of exceptions were taken, and when the case came up before the superior court by writ of *certiorari*, these bills of exceptions were considered, just as if they had been set out by the justice in his judgment. The court say page 558 : "We observe the justice has made a statement of the facts in the form of exceptions made by the defendant. This is not the regular method. On the hearing of these militia-causes the justice is not bound to receive any special plea, or file exceptions; but it is very proper, when the defence is a matter of law, for him to state the facts. And he may conveniently do it in this form : That on the hearing of the parties the following facts were proved or admitted, stating them—then he proceeds to convict or acquit the defendant according to his own opinion of the law and evidence." In this case the judgment of the justice was reviewed, and the proceedings quashed, upon an error of law based on facts appearing only in the bill of exceptions.

In the case of the *Inhabitants of Mendon* v. *The County Commissioners of Worcester*, 2 Allen 463, it was decided, that when the writ of *certiorari* is the proper remedy to bring before a superior court the proceedings and judgment of an inferior tribunal, and no mode is provided by law, whereby questions of law acted on and decided by the inferior tribunal can be made to appear, it is proper for the court in issuing the writ of *certiorari* to order the inferior tribunal to bring before the court the record of their proceedings *accompanied by a statement of their rulings*; and this is done, when there is no mode provided by law to bring up such questions from such tri-

bunal by appeal, exception or otherwise. This was done, as the opinion of the court shows, simply because in the statute-law of Massachusetts there was a provision entirely similar to the provision in our statute-law giving the superior court general superintendence over the proceedings of inferior courts by *mandamus, certiorari,* &c.

In the case before us it was the duty of the county court to place upon its record if asked, the facts, so far as necessary to show its rulings, and also what were its rulings on all questions of law arising in the case, when these rulings were objected to by either party, in order to afford to the parties their right to have these proceedings of the county court reviewed by the circuit court; and if it failed to do so, it might have been compelled by *mandamus* to perform this duty. But in this case the court has not failed to do its duty in this respect. It is true, that the facts and its rulings on them, which were objected to by the parties, were not spread at large on the record-book, as they might have been; but the county court did, what was the equivalent of this, they stated on their record, that certain bills of exception were taken, which bills are made a part of the record, and which bills are identified by the signatures and seals of all the members of the court. In default of any statute papers not copied on the record can be made parts of the record by being referred to on the entries in the record-book. Thus while in England it is usual to enter on the record-book in chancery causes the answers and other pleadings with the depositions, with us this is never done but they are simply referred to in the decree of the court and are thereby made as much a part of the record as it they had been entered at length on the record-book. This is our practice; and it is one, which has grown up and been approved without any statute establishing it.

We are therefore of opinion, that the bills of exception in this case and the statements contained in them constitute as much a part of the record in this case, as they would, had the case been one, which was brought before us by writ of error. This results, as we have seen, from the fact that the circuit court had a right to review all the legal questions, which were decided in this case by the county court, and which legal questions appear only from an inspection of these

bills of exceptions. Of course in any State the courts of which hold, that such legal questions, as are presented by bills of exceptions, would not be reviewed in the superior court, but only jurisdictional questions, it would as a consequence be held, that these bills of exceptions could not be considered and would not constitute any part of the record; but, as we have said, the circuit court had a right to review the questions of law raised by the bill of exceptions in this case; and therefore they constitute, as we have shown, a part of the record. But it is claimed, that the opinion of the county court, which is made a part of bill of exceptions No. 2 can not properly be regarded as a part of the record, because the case could not be reversed on account of errors in the views and opinions of the county court however great this Court may consider them to be, if the conclusion reached by the county court was correct, &c. This is doubtless true; but this opinion does more than give the legal views of the county court, it also states, what conclusions of fact the court drew from the evidence; and this is certainly to have its weight with this Court. These inferences of fact, as to what the evidence proved as drawn by the county court, who heard the evidence, are entitled to great consideration and approach conclusiveness. The opinion therefore is proper to be considered as a part of the record, as it certifies to us the conclusions of fact reached by the county court and also indicates to us in a clear manner their views of the law, which should also be considered by us, though we would not reverse the case because their views of the law were erroneous, if we reached the same conclusion as they did but on different principles of law.

It remains now to decide this case on its merits. The principal question involved in this case is: Was Thomas Swinburne at the time of his election and qualification as clerk of the circuit court of Kanawha county in October, 1878, eligible to this office? This depends upon whether he was then a citizen of the State of West Virginia. That he was born in England of English parents, who were residents and citizens of Great Britain, is admitted; and that he resided there, till he was eleven years of age. But he claims, that on the 9th day of November, 1878, after his election and

qualification as such clerk, and after this suit had been instituted, he was naturalized by an order made by the circuit court of Raleigh; and by this order he was declared a citizen of the United States from the date of his discharge as a soldier from the service of the United States; and that this discharge was dated January 24, 1865, long prior to his election and qualification as such clerk. His counsel insist, that whether this declaring in this order, that his qualification as a citizen should thus date back some twelve or thirteen years, was or was not proper, it was an order made by a court authorized to naturalize foreigners, and therefore must be held as valid in this, which is called a collateral proceeding.

Now the notice, which had been given him of this contest, in express terms alleges, that he was not and never had been a citizen of the United States or of the State of West Virginia; so that this question was and is the direct question in issue in this case. But in truth this order made by the circuit court of Raleigh, so far as it attempted to make him a citizen from a period ante-dating the order twelve or thirteen years was a perfect nullity. Neither that court nor any other court had any pretense of authority to make a person a citizen and to confer on him the rights of a citizen from a time ante-dating the order of the court naturalizing him, to the extent this court attempted to confer citizenship prior to the time, when it entered this naturalization order, it acted without any authority or jurisdiction, and its act was to this extent from the beginning utterly null and void. This was the opinion of the county court in this case and in this it was clearly right.

But it is claimed by the counsel of Swinburne, that he was in October, 1868, a citizen of the United States and of West Virginia, because his father, Ralph Swinburne, was naturalized in the year 1856, and that he Thomas Swinburne was then a minor only sixteen years of age, and by virtue of the prior clause of section 2172 of the Revised Statutes of the United States p. 328 he became a citizen from that time. If the facts be as claimed, unquestionably Thomas Swinburne has been a citizen of West Virginia from its organization and was eligible to the office of clerk of the circuit court of Kanawha at the time of his election. But the county court,

who heard all the evidence in this case, came to the con-
clusion, that it was not proven, that in point of fact Ralph
Swinburne, his father, was never naturalized till the year
1866, at which time Thomas Swinburne was no longer a
minor, being then twenty-six years of age.    They say in their
opinion:  "There is no record of any proceedings, by which
Ralph Swinburne was naturalized in 1856.    He says he took
the oaths required by law before Mr. Quarrier or the court
and remembers, that Mr. Quarrier said to him, that if any
person questioned his being a citizen to send them to him;
but this is no evidence of the examination of witnesses, the
proof of residence, of character, of attachment to the govern-
ment of the United States or of the judgment of the court,
all of which are necessary to make a citizen of a foreign sub-
ject.    There is much in the evidence going to show, that
Ralph Swinburne supposed he had become a citizen from
about the year 1856; but these circumstances do not amount
to proof, particularly as he is here and might have furnished
from his recollection the whole facts, including the names of
witnesses, who proved his character, residence, and attach-
ment to the United States and also the judgment of the
court."

This is sufficient to conclude this controversy as to the fact
whether Ralph Swinburne was or was not naturalized in 1856.
It is not the province of this court or of the circuit court to
supervise or overrule on a writ of *certiorari* the conclusion of
the county court on an inference of fact drawn from the evi-
dence, when such inference is sustained by substantial evi-
dence, even though we might have drawn a different infer-
ence from the evidence.    But in this case we are satisfied, that
the inference of fact, which the county court draws, is entirely
correct and is fully sustained not only by the negative facts
and circumstances, to which the court refers, but also by
very strong positive evidence ; and we are further satisfied,
that the circumstances relied on to prove this naturalization
of Ralph Swinburne in 1856 when taken together are very
weak.

The first in point of time of these circumstances is a deed from
Andrew Cunningham and wife to Ralph Swinburne dated No-
vember 21, 1855, and duly recorded on that day conveying to

him a farm of 186 acres in Kanawha county, on which he has since resided. This is regarded by the defendant's counsel as very strong evidence, that he was naturalized, as the State took no steps to have this land declared forfeited as held by an alien. And if such evidence was admissible, it would be the very strongest circumstance, from which naturalization might be inferred of any of those offered in proof in this case. But, it seems to me, it would be very unsatisfactory evidence certainly very far from conclusive; for if it could be regarded as conclusive, the State never could have land declared as forfeited because held by an alien. It would be strange law indeed, if in such a proceeding the holding of the land should itself be regarded as satisfactory evidence of the right to hold and own the land. But unfortunately for the defendant it is conclusively proven, that Ralph Swinburne was, when he bought this land, unquestionably an alien. He does not even in his own testimony pretend to date his naturalization prior to 1856; nor is there a particle of testimony to indicate, that at that time or prior thereto he had ever voted or exercised any of the rights of citizenship. But the purchase of this farm does unquestionably prove, that Ralph Swinburne believed then, that he was a citizen, and from his subsequent conduct, and from what he has said, I am bound in charity to believe, that he supposed in 1855, when he bought this land, that he had been a citizen from December 7, 1852, when he appeared before the circuit court of Kanawha and declared his intention to become a citizen, and took an oath of allegiance to the United States and an oath relinquishing and renouncing forever allegiance and fidelity to any foreign prince, potentate, State or sovereignty whatever and particularly all allegiance and fidelity, which might be claimed by Victoria, Queen of Great Britian and Ireland, or any of her successors. He in his declaration of December 7, 1852, had declared his intention to renounce and relinquish this allegiance, and being a foreigner unacquainted with our laws he may well after the lapse of several years have taken up the impression, that he had then become a citizen of this country. His purchase of this land in 1855 goes very far to prove, that he then so thought; and it is quite natural, that he may after

many years have been under the impression, that he took the necessary oaths including the oath of renunciation of allegiance to his former sovereign, instead of having merely declared his intention to renounce such allegiance. His subsequent conduct and declaration I feel bound in charity to consider as showing, that he thought he had taken such oaths years before in 1852.

After purchasing a farm and moving on it to reside in 1855 it was natural, that Ralph Swinburne, who was then certainly an alien, but who obviously but erroneously thought himself a citizen, should afterwards exercise the rights of a citizen; and accordingly from that time, till the war broke out, he voted and took an active part in elections; and 1858 having become a Baptist preacher on March 15 he applied to the circuit court of Kanawha for testimonials, which would authorize him to administer the rites of matrimony, and took the required oath to obtain such testimonials, an oath of allegiance to the commonwealth of Virginia. All these acts show clearly, that Ralph Swinburne from 1855 to the breaking out of the war was under the impression, that he was a citizen of the United States and had been duly naturalized; but he admits, that when the most important of these acts, the purchase of his farm in 1855, occurred he was in fact an alien; and this being admitted, the other acts do not even tend to show, that he was naturalized after 1855, but only show, what was perfectly natural, that the false impression then clearly shown to be on his mind continued there. Nor does the fact, that he voted, took part in elections and married people after 1855, tend in any but a very weak manner to show, that he was really a citizen; for after he bought and removed on to his farm in 1855, the inevitable conclusion, which the public would draw, was that before so doing he had become naturalized, which it is not now pretended, that he had. His statement to the Confederate officer, when he was under arrest, that he could not conscienciously take an oath to support the Confederate States, because he had taken an oath of allegiance to the United States, would appear to indicate, what was not unnatural, that he supposed then, that he took this oath in 1852, when he made his declaration; but his subsequent consent to take this oath of allegiance

would rather seem to show, that when he made the statement, that he had taken an oath of allegiance to the United States, he merely meant to deceive and mislead the Confederate officer; but perhaps this consent was the result of human weakness and the misleading advice of friends, as he states.

In 1866 after the war, and when the law required voters to be registered, when Ralph Swinburne offered to register as a voter, the registrar required of him to produce the evidence, that he was a citizen, his naturalization papers. He said, he did not have them, they were in the clerk's office, referring, I would presume, to the papers of 1852, his declaration; for we have seen that as early as 1855 he thought, that these declaration-papers made him a naturalized citizen. A few days after the registrar told him, that he could not find in the clerk's office his naturalization papers; and witness then went before the circuit court on June 5, 1866, as an alien, and as such asked to be admitted to citizenship; and having proved, that he had resided in the United States for five years and within West Virginia for one year at least and had complied with all the other requisites and having taken an oath to support the Constitution of the United States, and that he renounced all allegiance to Victoria, Queen of Great Britain, it was ordered, that he be admitted and declared to be a citizen of the United States. Thus he seems to me to have done, what it was perfectly natural, that he should do, as soon as he found, that the impression, under which he had been laboring since 1855, that he was a citizen, was false, that is, he at once took the necessary steps, to become a naturalized citizen. Nor did he, when informed that no naturalization-papers were to be found in the clerk's office, according to his own statement act, as one would have naturally acted, who knew, that he had been regularly naturalized, in 1856 or 1857. He did not, so far as the record shows, and he does not say he did, go to the clerk to make for him a copy of these papers from the record-book, nor did he examine the record-book of 1856 and 1857 to find an order, which, he now says, was, as he then thought, on the books. But he put himself to the trouble and expense of getting his friends to attend the court to prove his character,

and admitting himself to be an alien took the required oaths of naturalization.

This conduct, it does seem to me, shows beyond doubt, that in 1866 Ralph Swinburne knew, that he had never taken out his naturalization papers, and that prior to that time he did not know, that it was necessary for him to do so in order to be a citizen. He now comes forward and testifies, that in 1856 or 1857 he took the oath of allegiance and naturalization, and that it was administered either by the clerk or the court; that the clerk told him, when he first took the oath, that he had not time to write his papers but would do so, as soon as he got leisure, and if any one disputed his having taken the oath, to send him to the clerk's office. The record-books of this clerk's office are unmutilated and accessible; and these books have been carefully searched, and it appears from them, that no entry was ever made of his naturalization in those years or at any time prior to 1866. Ralph Swinburne does not state, who were the witnesses, whom he must have produced in court to prove his character &c., if he was naturalized in 1856 or 1857; and it can hardly be supposed, that he has forgotten who they were, and could yet correctly remember the oath which he took, and what the clerk said to him. The production of these witnesses was certainly very necessary under the circumstances to render his statement even probable; and their absence satisfies me, that he is laboring under a mistake, and that in his mind the old mistake, which he was laboring under certainly in 1855, when he bought his farm, has been again revived, and that he is confounding the declaration which he made in 1852, with the imaginary naturalization in 1856 or 1857.

The fact, that Thomas Swinburne was registered in 1866 and for the next five years as a voter and held offices without objection, is regarded as additional evidence, that his father, Ralph Swinburne, was naturalized, while he Thomas Swinburne was an infant, that is prior to 1862, for it is not pretended, that Ralph Swinburne himself was naturalized, while he was thus being registered and holding offices. But it is obvious on the face of all these register books, that Thomas Swinburne has not registered, because it was supposed his father had been naturalized before 1862. On their

face these books state, that Ralph Swinburne was natural-
ized in 1866.   It would seem then, that Thomas Swinburne
was registered as a voter either for the insufficient reason,
that he had served in the United States army, or because of
the utter carelessness or unreasoning prejudice of the regis-
trars.    These books showed that he was not entitled to vote;
for they showed that his father was an alien till 1866, and
that the son was also an alien and that he was more than
twenty-one years of age, when his father was naturalized in
1866, for his age is stated in these registrar-books.    We can
therefore only infer from Thomas Swinburne's voting and be-
ing allowed to hold office, that those, whose duty it was to
declare by their registrar-books, who could hold office and
vote, performed this duty in a grossly negligent manner or
with prejudices so strong as to blind them to the proper per-
formance of these duties.

I have thus far, as did the county court of Kanawha, con-
sidered this case, as if all this parol evidence introduced by
the defendant as tending to prove, that in 1856 or 1857
Ralph Swinburn was naturalized before the circuit court of
Kanawha was admissible; but it seems to me clear, that none
of this evidence was admissible.    It had, when viewed in its
legal aspect, no tendency even to prove, what it was intro-
duced to prove.    The naturalization of a foreigner is by the
laws of the United States a proceeding in a court of record,
in which the court upon certain facts being satisfactorily
proven and a certain oath taken by the applicant by its judg-
ment declares, that the alien is admitted to be a citizen.    See
Rev. Statutes of U. S. 2d edition, sec. 2165.   If the records of
this court at the time when it is claimed, that an alien was
thus admitted to citizenship, is produced and shows, that he
was not only not so admitted but not admitted at all, how
can any parol evidence on any conceivable legal principle be
admitted to prove a fact, which it is conclusively shown can
not possibly exist?   The defendant's counsel refer to the fol-
lowing authorities to show that in this case such parol evi-
dence was admissible:      *Nalle's Representatives* v. *Fenwick*,
4 Rand. 585–588; *Sasportas* v. *De la Motta*, 10 Rich. (S. C.)
Eq.  38; *Campbell* v. *Gordon*, 6 Cranch. 176, *Blight's
Lessee* v. *Rochester*, 7 Wheat. 536; and an opinion of Judge

Blatchford in the United States circuit court for New York decided June 1879 and reported in the New York Herald, a newspaper. None of these cases seem to me touch the subject under consideration.

In the case of *Nalle* v. *Fenwick*, 4 Rand, 586–587 the facts were as follows: Edward Rice, an Irishman by birth, emigrated to this country at some time prior to 1779, when the record does not show, and it is probable, the time of his emigration was unknown, he having been dead many years; but he was residing in Eddington, North Carolina, in 1779, where he was then voting at elections and certainly participating in them. This being during the revolution, such was the temper of the times and the watchful jealousy of Americans towards foreigners that it was impossible for an alien to have acted, as he did, and that no alien would then have been permitted to remain in the country. In 1783 land was conveyed to him; and in 1784 Sam Savage, who, it is proven, knew him intimately, devised land in Culpepper county Virginia to him. He then still resided in North Carolina. He afterwards, but when does not appear, removed to Virginia and took here too an active part in elections and was at one time a candidate for the Legislature in Princess Anne county. He died, but when does not appear. This land having been sold for taxes and passed into other hands as far back as 1789 a question arose as to the title. Rice had long ago died without heirs and without a will. Fenwich had an agreement, which he had made with him in his lifetime, and also a judgment against him, which was a lien on the land, if Rice was a citizen entitled to hold land, and sought by a bill to sell this land under this agreement or to satisfy his judgment. The court on proof of these facts held, that after the lapse of forty-five years it would be presumed, that Rice had been naturalized and was entitled to hold this land. It was obviously impossible under such circumstances to ascertain, when or where Rice was naturalized, and no record-books were or could be produced, in which, if he had been naturalized, it would appear.

This case only proves, that where it is unknown, when an alien was naturalized, and it is impossible to produce the record of his naturalization, it will under some circumstances

be presumed by proof of facts, which could not well have existed, unless he was naturalized. But to presume under such circumstances, that one has been naturalized, is a very different proposition from saying, that when the record-book is produced, by which his naturalization must appear, if he ever was naturalized, the court will permit it to be in effect contradicted by parol evidence tending to show, that he was naturalized, when the record shows, that he was not.

The case of *Sasportas* v. *De la Motta*, 10 Rich. Eq. decided in 1858 was based on the same principles as this Virginia case; and the same conclusion was reached. The subject of the controversy was, whether Abram Sasportas was a citizen. He was proven to be a foreigner by birth; but this litigation having arisen many years after his death, the evidence as to when he emigrated to this country, was vague and uncertain. The court say page 49: "On the evidence we might presume without much straining, that Abraham Sasportas was resident here July 4, 1776." This of course would have made him a citizen. But the court based its decision on the supposition, that he became resident here in 1778, at which time, it was proven clearly, he was here. The evidence failed to show, where he was when he first came to this country. In March, 1778, the Legislature of South Carolina required by an act an oath of allegiance as a pre-requisite to citizenship; and in 1784 an act was passed requiring this oath to be taken before one of the judges of the common pleas. In 1788 an act was passed requiring the Secretary of State to keep a book for the registration of such certificates of oaths of allegiance, as had been furnished by judges of the court of common pleas to individuals; and it provided, that persons, who demanded any privilege such as voting, should not exercise it, unless in a specified time they produced a proper certificate from the Secretary of the State. But this act was not regarded as affecting his right of citizenship, but was personal to him, affecting only the privilege, which he asked for, till he produced such certificate from the Secretary of State. The evidence showed, that Abram Sasportas was married in Charleston in 1778; that he fought as an officer on the American side during the revolution; that as early as 1785 real estate was conveyed to

him in North Carolina, and that he frequently bought and sold real estate afterwards; that he was reported to be a citizen by the oldest persons, who after this great lapse of time could be produced; that he lived here and exercised the rights of a citizen here from the earliest date, to which his history could now be traced. The court under these circumstances presumed, that he had taken the required oath, and say: "The interest of mankind requires us to presume, that the long enjoyment of a claim is rightful; and in protection of such claim that a grant of land from the State or of administration from the ordinary or of any muniment of title once existed, and if not produced, that it has been lost by devouring time."

But surely this case will not sustain the position, that where it is proven, that if the document ever existsd, it still exists and must be in this record-book produced to the court, and it is shown, that it is not there, that it could then be proven by parol evidence, as in such case it is positively shown, that it "has not been lost by devouring time." There can in such case be no room for presumptions.

In the South Carolina case it is obvious, that it was impossible to produce the record-book, in which this oath was recorded, as it was not known, where it could be found, or even whether the naturalization was in South Carolina or in some other State. But in the case before us the record-book, in which this naturalization must appear is proven and was examined; and the naturalization was found to have no existence in point of fact.

In the case of *Campbell* v. *Gordon*, 6 Cranch. 176, the question was, whether one William Curry had been naturalized by an order made by the district court held at Suffolk. The order of the court was produced; and the entry on the record-book was: "At a district court held at Suffolk, Octobter 14, 1795, William Currie, native of Scotland migrated into the commonwealth, took the oath, &c." And it was proven by the clerk, that this was the form, in which the order was made admitting any person to citizenship in that court; and on it a certificate of naturalization made out in due form was given. Such a certificate was produced signed by the clerk of the court, wherein this order was made, in his official

capacity. It purports to be a copy from the record; but the words, &c., are enlarged, and in their stead all the requisites of the law are set out as complied with. The court held, that this order was sufficient to naturalize him. All that is distinctly stated in this order is, that he took the oath, and then the words, *&c.*, are added to imply, that all the other requisites of the law were complied with. The court say:

"It is unnecessary to decide whether in the order of time the satisfaction, as to the character of the applicant, must be first given, or whether it may not be required, after the oath is administered and if not then given, whether a certificate of naturalization may not be withheld. But if the oath be administered and nothing appears to the contrary, it must be presumed that the court, before whom the oath was taken, was satisfied as to the character of the applicant. The oath when taken confers upon him the rights of a citizen and amounts to a judgment of the court for his admission to those rights. It was therefore the unanimous opinion of the court, that William Currie was duly naturalized."

This case simply decides, that a brief minute entered on the record-book of the naturalization of a foreigner may be in his certificate so enlarged as to include the requisites of the statute, as if entered at large on the record-book. It is very similar to the enlargement, which is constantly made of the abbreviated entries, *C. O.* and *O. C.*, which are made on our rule books, and which may be enlarged into a formal office judgment and office judgment confirmed. When the court say, "The oath when taken confers upon him the right of citizenship," it is obvious, that they meant, when the record showed that the oath was taken, it would suffice, and it would be presumed, that it was not administered or at least an entry was not made of it, till all the other requisites of the statutes were complied with. It would be an utter distortion of this language and decision to hold, that the taking of the oath might be proven by parol testimony when the record was produced, and it failed to show any naturalization or attempt at naturalization.

In the case of *Blight's Lessee* v. *Rochester*, 7 Wheat. 546; The question arising in an action of ejectment was, whether when it was proven, that a person was born in a foreign country

and had here for a long time held real estate, and no proceedings had ever been instituted against him for escheat and forfeiture, the court below erred in refusing to instruct the jury, that "they had a right to presume, that he was a citizen of Virginia or of some other of the United States." The supreme court held, that the court below did not err in refusing this instruction. The court however say, p. 546: "The alienage of James Dunlap being fully proven, and the laws of Virginia requiring, as indispensable to his citizenship, that he should take the oath of fidelity to the commonwealth, in a court of record, of which the clerk is directed to grant a certificate, we do not think, that this fact, which, had it taken place, must appear on record, ought to be presumed, unless there were some other fact, such as holding an office, of which citizens alone are capable, or which required an oath of fidelity, from which it might be inferred." In that case, if James Dunlap ever was naturalized, the proof showed, that it was not known in what State; but though this controversy arose more than thirty years after his death, the court did not think a presumption of his being a citizen could arise from his having held real estate a long time, and no proceeding, to escheat it had been instituted; but such presumption could arise from his holding offices, which alone citizens could hold.

There is nothing in this opinion of the court, and certainly nothing in the case itself, which countenances the idea, that by any sort of parol evidence a presumption could arise, that one was naturalized, when it was proven by a record-book, in which alone, if he were naturalized, it must have appeared, that he was not in point of fact ever naturalized. But, I apprehend, presumptions are allowed in questions involving the title to land in favor of those in possession of the land, which would not be allowed in any other case. But be this as it may, there is nothing in the decision of the court in that case, which countenances the defendant's claim in this case ; for the court approved the refusal of the court below to instruct a jury, that they could presume citizenship from the parol evidence.

The case of *Peter Coleman* v. *John I. Davenport* decided by Judge Blatchford is so imperfectly reported in the New York

Herald of July 3, 1879, that it is difficult to fully understand it. The opinion is given; but the facts, on which it was based, are not stated. As I understand the case, it has no bearing on the question which we are now discussing. The question before that court was, whether certain rather vague entries on "the Naturalization Index," a book which had long been kept, and which the court regarded as a record-book of the court were sufficient to make him a citizen. The question was similar to that involved in *Campbell* v. *Gordon*, 6 Cranch. 182, and the court did not in upholding the naturalization go any further than, if as far as, the court did in the case in 6 Cranch. In the New York case as in that reported in Cranch. a certificate had been made out by the clerk; and in the New York case he attached to it the seal of the court, in which the brief entries on this naturalization index had been entered, and the certificate had been written out, as if a full entry had been made on the record showing that all the provisions of the statute had been complied with; and it was also proven, that this had been the form of making orders in such cases for twenty-four years, and that from fifty to sixty thousand orders had been entered in this form.

Our conclusion is, that when the record-book of a court, before which it is claimed a foreigner was naturalized, is produced, and on its examination it appears, that he was not naturalized, no parol proof can be received, that he was naturalized before this court, nor can any facts, such as his voting or holding office, in such a case be introduced as the foundation for the presumption, that he has been naturalized, there being in such case no room for any such presumption.

But the present case is still stronger against the defendant; for in this case the record-book of the circuit court of Kanawha was produced, and it appeared thereby, that on the 15th day of June, 1866, Ralph Swinburne was an alien owing allegiance to Victoria, Queen of Great Britain and Ireland, and as such alien he on that day appeared before said court and asked to be admitted as a citizen of the United States, and having complied with the law and taken the oath to support the constitution of the United States and to renounce his allegiance to Queen Victoria he was admitted

as a citizen of the United States. And now it is gravely insisted, that in contradiction of this record it may be proven by parol, that he had not owed allegiance to Queen Victoria for years prior to this time, and that he was not at that time and had not been for years an alien, and that he was not admitted at that time, as the record says, to citizenship but had been a citizen for years prior to that time. It seems to me such parol testimony ought not to have been received and cannot be considered by this Court. Its receipt would be in violation of fundamental principles of evidence, which have not been and cannot be disputed.

The only other ground, on which the defendant claims, that he was naturalized at the time, when he was elected and qualified as clerk, is that by virtue of the last clause of section 2172 page 382 of the Revised Statutes of the United States (1873) he became a citizen from the date these revised statutes went into effect, December 1, 1873, as his father Ralph Swinburne was certainly naturalized before that time, that is in 1866. This section is as follows:

"Sec. 2172. The children of persons who have been naturalized under any law of the United States or previous to the passage of any law on that subject, by the government of the United States, under the laws thereof, may have become citizens of any one of the States, under the laws thereof, being under the age of twenty-one at the time of the naturalization of their parents, shall, if dwelling in the United States be considered as citizens thereof; and the children of parents, who now are or have been citizens of the United States, shall though born out of the limits and jurisdiction of the United States. be considered as citizens thereof; but no person heretofore proscribed by any State or who has been legally convicted of having joined the army of Great Britain during the revolutionary war shall be admitted to become a citizen without the consent of the Legislature of the State in which such person was proscribed."

It is claimed, that by virtue of the last clause of this section Thomas Swinburne became a citizen on December 15, 1873, when these Revised Statutes took effect without any action on his part and even in opposition to his wishes, though he was an admitted alien the day before, and though

he was then thirty-three years of age, simply because his father, Ralph Swinburne, was naturalized in 1866, when Thomas Swinburne was twenty-six years old. If this be the true construction and effect of this section, it would equally have operated against his consent to have made Thomas Swinburne a citizen of the United States, though we had then been at war with England, and though Thomas Swinburne had been in the army of Great Britain, to which country he then owed allegiance; and if he had been taken prisoner by us after December 1, 1873, he could have been put to death as a traitor. And this would be equally the consequence and result of this interpretation, had Thomas Swinburne never left England, where he was born. Such results of this construction are so obvious, so unjust and so absurd, that it is highly improbable, that this is its true meaning.

The counsel for the contestant have contented themselves with pointing out the absurd results, to which this construction would lead, and have referred to no authorities to aid in its true construction, except that they have filed with this brief a letter from Hon. G. S. Boutwell and another written by the direction of Senator Edmunds of Vermont, in which letters these gentlemen give it as their opinion, that the word children, as used in the latter clause of this section, means minor children. They assign no reasons for their opinions and refer to no authorities. Their letters therefore were not filed by the counsel for the plaintiff as arguments and must have been regarded as authorities. How they could have supposed, that the private opinions of these gentlemen would be regarded as authority by this Court, I cannot account for. These private opinions are entitled to no consideration or weight. It is but just to these gentlemen to say, that there is nothing on the face of their letters to show, that they ever supposed, that they would be used as an authority in this or in any other court.

The counsel for the defendant on the other hand refer to no authorities to aid in the construction of this section except *Charles* v. *Monson & Bromfield Manuf. Co.*, 17 Pick. 70 and *Campbell* v. *Gordon*, 6 Cranch. 176; and neither of these cases throw any real light on the interpretation of this section, so far as such

interpretation would affect this case. This section of the Revised Statutes is *verbatim* the language used in an act of Congress passed April 14, 1802: Everything that is said in 17 Pick. on the subject (see page 76) is: "As to the plea of alienage we think it is well answered by the replication. The statute of the United States passed April 14, 1802, provides, that the children of persons, who then were or had been citizens of the United States, should be considered as citizens, with a proviso not affecting the present question. The replication brings Miranda Charles within the description by showing, that her father had been a citizen of the commonwealth after the treaty of peace and after the adoption of the constitution. It does not distinctly appear when her father died, nor is it material.

In the case of *Manchester* v. *Boston*, 16 Mass. 230 this statute came under the consideration of the court. They say: 'Without doubt, the object of Congress, in making this provision, was to naturalize the children of actual citizens, who might be born abroad, whether their parents were living or not at the time of passing the act.' The court is therefore of opinion, that the plea of the alienage of Miranda, one of the complainants, cannot be sustained."

It is true, this replication did not state, that Miranda was an infant at the time of the passage of this act; but it is also true, that no objection was made by counsel to it on that account, but it was insisted, that by this act both of the parents of a child born out of the jurisdiction of the United States must have been citizens of the United States to confer citizenship on the child; and this fact was not alleged in this replication. It does not distinctly appear, whether she was an infant in 1802 or not; but the evidence as stated does show, that in all probability she was a small child. It is obvious therefore, that the court neither expressed an opinion upon, nor considered, the question, whether, if she had been twenty-one years of age in 1802, she would have become a citizen on the passage of this act, because her father had been naturalized, though she was born in Canada. Neither the case in 16 Mass. nor that in 6 Cranch. referred to throw any light on the question under discussion.

In the absence of authority I am of opinion, that the words

used in the latter part of section 2172 should be construed, as if they read, " and such children of persons, who now are or have been citizens of the United States, shall though born out of the limits and jurisdiction of the United States be considered as citizens thereof." Minor children had just been spoken of in the previous portion of this section; and by the word, " children," in the latter portion of this section was meant such children as had just been named, and adult children were excluded from its operation. If this construction were not given and if the word, " children," in the last portion of this section were interpreted to mean children of all ages and wherever residing, the statute would lead to absurd results, making citizens of persons, who were perhaps born of alien parents, and who were living in a foreign land, and who had resided, till they were old men, and still resided in the country, to which was due their allegiance. Such absurd results will be avoided by a very natural construction of the language and merely by interpreting the word children in the latter part of the section to refer to the same class of children as had just before been spoken of. The latter clause of this section would then operate by making such children, though born out of the jurisdiction of the United States, citizens of this country.

But even if it should be considered, that this construction cannot be placed on this act of 1802, and that the word, " children," in the latter part of this section was intended to include and did include adult children, yet such construction could in no manner affect this case.

The Revised Statutes of the United States had their origin in an act of Congress passed June 27, 1866, ch. 140 § 14 p. 74 found in the Appendix to the Revised Statutes of the United States second edition p. 1089. This act provided for the appointment of a commission "to revise, simplify, amend and consolidate all statutes of the United States general and permanent in their nature, which shall be in force at the time such commissioners shall make the final report of their doings." In the performance of their duty they incorporated in their report, as adopted by Congress, this section 2172 precisely as it was in the act of 1802, the language being in no manner changed. At the close of these Revised Statutes, title

74, it is provided p. 1085 § 5595: "The foregoing seventy-three titles embrace the Statutes of the United States general and permanent in their nature in force on the first day of December, 1873, as revised and consolidated by commissioners appointed under an act of Congress; and the same shall be designated and cited as the Revised Statutes of the United States." Section 5596 provided: "All acts of Congress passed prior to said first day of December, 1873, any portion of which is embraced in any section of said revision, are hereby repealed."

This section 2172, the same *verbatim* as the act of 1802, uses this language: "And the children of persons, who *now* are or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens thereof." The county court in their opinion regard this section, as if after the repeal of the act of 1802 at another session of Congress it had been again re-enacted in the same words. So that, while the act of 1802 was in force the word, "now," used in it meant, "the year 1802;" but that the identical same words, if used in a new statute enacted subsequently to the repeal of the act of 1802, would have a very different meaning, and the word, "now," would be construed as referring to the date of the new enactment of this law. If this act of 1802 had been repealed prior to the passage of the Revised Statutes, the word, "now," used in this section 2172 would certainly mean December 1, 1873. But the act of 1802 was not repealed prior to the passage of the Revised Statutes. In fact the above section has been in full force from the date of its passage to this time; for while in words it was repealed by section 5596, yet at the very moment of its nominal repeal it was in the very same act, section 2172, continued as law in the same words, in which it had always stood. So that there has never been a moment of time since 1802 when this section 2172 has not been law. This revision and arrangement of the statutes in force, when it uses the same language as an old statute, must be regarded as merely continuing it in force and it is in no manner affected by the revision. I am therefore of the opinion, that this section 2172 is but the act of 1802 continued in force; and that it was not the purpose of Congress in any

manner to alter, modify or change the law, so far as it was contained in the act of 1802 as copied in section 2172; and that therefore the word, "now," as used in this section means precisely, what it did before, and has reference to the time, when these provisions in section 2172 first became law, that is, to the year 1802.

This being the meaning and true interpretation of this section 2172, it is entirely immaterial, so far as this case is concerned, in what sense we understand the word, "children," used in the latter part of this section; for it will in effect read: "The children of persons, who in 1802 or prior thereto had been citizens of the United States shall be considered citizens thereof."

Of course Thomas Swinburne could claim no rights of citizenship under this last clause of this section so interpreted. And we have seen heretofore, that under the first clause he could claim no such rights, as he was more than twenty-one years of age, when his father was naturalized in 1866. Nor can he claim in this controversy any right of citizenship because of his own naturalization, as he was not naturalized, till after this proceeding was instituted. My conclusion is, that he never was a citizen of the State of West Virginia or entitled to be considered a citizen of this State till November 9, 1878, when he was naturalized by the circuit court of Raleigh; and that this naturalization took effect then and had a prospective operation only, and did not, as the order making it ineffectually declared, operate from the time of his discharge from the service of the United States or from any previous time.

There are several positions of the counsel for the defendant, of which I have thus far taken no notice, because it did not seem to me they were worthy of serious consideration; but as they have been earnestly pressed, I will briefly state my views of them.

It is urged, that the fact, that Thomas Swinburne was registered by the registrars as a voter unappealed from and unquestioned by any proceeding for the purpose, is conclusive, that he was a voter, and that like any other judgment it is not only conclusive of this fact but of every other fact necessary to support it. This is a mistake as to the extent,

to which *res adjudicata* extends in any case, as might easily be shown; but the principle sought to be applied has no application in this case. The registration of a person as a voter conclusively settles nothing, but that he was a qualified voter for the year in which he was registered, and that the fact of his being a voter could not that year be disputed at the polls; but it is utterly valueless even as evidence for any other purpose in this case for reasons we have stated. These registrations were not even admissible as evidence.

The same reasoning is attempted to be applied to the attempt made to ante-date his naturalization by the order made by the circuit court of Randolph. This order, so far as it ante-dates the time, when his naturalization is to take effect, so far from being conclusive, was a mere nullity, being an order which no court had any authority to enter.

Another position taken is, that the naturalization of Ralph Swinburne in 1866 related back to 1852, when he made his declaration, and he is therefore to be now considered as a citizen from that date. No authority is cited to sustain this novel position except a number of cases on entirely distinct subjects, in which for reasons applicable to such cases the law permits in certain cases a relation back. Thus an office found when returned relates back and vests title in the commonwealth from the finding. So the appointment of an administrator for certain purposes relates back to the death of the testator. A patent when issued relates back to the entry. A sale when confirmed by a court of equity relates back to the time of the sale. The astute counsel could have found no doubt many other cases, where the law allows such relation back, sometimes for all purposes, and at other times for certain purposes only. On the other hand innumerable cases might be cited, where there is no such relation back. Each case of this character is based on reasons applicable to it specially. But what possible bearing they or the reasons, on which they are based, have upon the present case, I confess I am unable to perceive. The only matter referred to in this connection, which has any reference to naturalization, is not a judicial case but the action of the Federal Government many years since in demanding the release of an

Austrian, Martin Coster, who had declared his intention to become a citizen of the United States, and who was afterwards unjustly imprisoned by the Austrian Government. This shows, that a person, who has declared his intention to become a citizen of the United States, has certain rights, which our government will protect. Doubtless he has many rights, which the courts will protect; but this certainly does not show, that he has all the rights of a citizen. If it shows anything, which has any relation to the matter before us, it shows too much. If Martin Coster had the rights of a citizen, he had them, before he was naturalized; for when he was arrested he had not been naturalized.

It is insisted, that Thomas Swinburne should not be prejudiced by a clerical error, that is, the failure of the clerk to enter on the record-book in 1856 the judgment of the circuit court, that Ralph Swinburne should be admitted as a citizen. There is no evidence, that the circuit court ever directed such judgment to be entered. Ralph Swinburne himself does not say so. All the evidence in fact on the point indicates, that there was no such clerical error and no such judgment of the circuit court. The inference, that there was, is based simply on the oath of Ralph Swinburne, that. he took then before the court an oath of allegiance and of renunciation of his fealty to Queen Victoria, a statement made by him more than twenty years after the occurrence. But it does not follow, if he really then took such oath, which from all the evidence I am satisfied he did not, that the court admitted him to citizenship. He does not pretend to say, that he produced witnesses before the court to prove his character, residence, &c., or that this evidence was satisfactory to the court, or that any judgment was directed to be entered, that he be admitted as a citizen. If he had asked the court at its very next term on this evidence to correct this supposed clerical error, is it not clear, that the court would not and could not have done it. Yet we are gravely asked after a lapse of more than twenty years to treat this case, as if there had been a clerical error, and it had been corrected by order of the circuit court.

There remains only one other question to be disposed of in this case: Was the plaintiff, John Dryden, eligible at the

time of this election to the office of clerk of the circuit court of Kanawha?

The Code of West Virginia, ch. 7 section 5 p. 71 provides: "If any person holding or expecting to hold any office under the laws of this State, sell the same, or let it to farm, either in whole or in part, or contract to do so, such person and the person who may buy, take to farm, or contract to do so, shall be thereby disabled from holding said office." The proof is that W. E. G. Gillison, then clerk of the circuit court of Kanawha for the term ending January 1, 1879, did on May 5, 1875, by a contract in writing sell to the plaintiff in this case, John Dryden, for fifty dollars per month the balance of his term of office; and that in pursuance of this contract John Dryden was appointed his deputy and took the exclusive possession of this office and held the same till January 1, 1879, doing all its duties and receiving all its emoluments. As we understand the above section, both the parties to this contract thereby disabled themselves from holding this office for the term ending January 1, 1879; and if by the terms of this contract there had been included in the sale the succeeding term of said office, beginning January 1, 1879, both of these parties would by this statute have been disabled from holding said office for the term commencing January 1, 1879. But this future term of this office was not included in said contract; and therefore neither of the parties to this contract disabled himself from holding such future term of this office, beginning January 1, 1879, if either of them should be duly elected thereto. I do not understand from this statute, that such contract for the sale of an office rendered a party ineligible in the future to hold that or any other office; it only disabled him from holding the office for the term covered by the contract. In other words, the making of such a contract is not a crime, to which the law has attached the penalty of ineligibility to that or any other office; but such a contract is one made against public policy and is void; and the law has attached as a penalty to the making of such a contract the forfeiture of the office by the party selling it, and a disability to hold the office for the term thus sold in whole or in part by the party purchasing; and if the contract is one for the sale of an office, which the party

expects in the future to hold, both of the contracting parties are disabled from holding this office for the future term thus contracted to be sold.   As this contract was for the sale of a term of the office, which expired January 1, 1879, it did not render ineligible to the office the plaintiff, John Dryden, for the term commencing January 1, 1879.

But John Dryden is not entitled to this office, because the record shows, that at the election he received but 2103 votes, while Thomas Swinburne received 2182.   Now though there is a diversity of opinion, as to whether when the candidate receiving the highest number of votes is ineligible for a cause *known* to the voters, or which they were *bound to know*, such as his having held or actually holding a public office, which rendered him ineligible to the office, which he seeks, the votes cast for him are to be regarded as if not cast at all, and the candidate, who is eligible who gets the highest number of votes should or should not be declared elected; yet in this country there is no question, but that when the candidate receiving the largest number of votes is ineligible for a cause *unknown* to the voters and which they were *not bound to know*, such as infancy, want of naturalization and the like, the election must be pronounced a failure and there must be another election.   See *Gulick* v. *New*, 14 Ind. 93–102; *State* v. *Swearingen*, 12 Ga. 23 ; *State* v. *Giles*, 1 Chand. (Wis.) 112 ; *State* v. *Smith*, 14 Wis. 497 ; *Saunders* v. *Haynes*, 13 Cal. 145; *State* v. *Gastinel*, 20 La. Ann. 114.

It follows, therefore, as the plurality of votes in this election were cast for Thomas Swinburne, and he was ineligible, because he was an alien, that the election must be held to be a failure, and the office of clerk of the circuit court of Kanawha declared vacant.   This should have been done by the county court of Kanawha and they erred in not so declaring in their final order made September 12, 1879, and in declaring, that Thomas Swinburne at the time of said election and at the time, when he received a certificate of election as clerk of the circuit court of Kanawha, was a citizen of the United States of America and of the State of West Virginia, and entitled to vote in said State, and eligible to be elected to and hold said office for said term, and that he at said election was duly and legally elected to said office, and is

legally entitled to enter into and perform the duties thereof for said term, and also in adjudging him his costs.

The circuit court of Kanawha erred in its final order made on December 19, 1879, in affirming said judgment of the county court and in adjudging costs to said Thomas Swinburne.

This Court must therefore reverse and annul said final judgment of the circuit court of Kanawha; and the plaintiff in the court below and the plaintiff in error, John Dryden, must recover of the defendant below defendant in error, Thomas Swinburne, his costs in this Court expended; and this Court must enter such judgment, as the said circuit court should have entered, and must reverse said final judgment of the county court rendered on September 12, 1879, and award to the plaintiff, John Dryden, his costs in said circuit court expended, and must declare and pronounce, that said Thomas Swinburne at the time of said election held on October 8, 1878, was an alien and not entitled to vote in the State of West Virginia, and ineligible to be elected to and to hold said office of clerk of the circuit court of Kanawha for the term of six years commencing on January 1, 1879; and it must therefore be declared, that said Swinburne at said election was not duly and legally elected to said office, and is not legally entitled to the same, and has no right to perform the duties thereof for said term; and it should be further declared by this Court that at said election there was cast for said Thomas Swinburne 2182 votes, for said John Dryden 2103 votes and for J. W. Parish 1176 votes; and that the said John Dryden was at the time of said election a citizen of West Virginia and entitled to vote in the State of West Virginia and eligible to be elected to and hold said office for said term, but that he did not receive a plurality of the votes cast at said election, but a plurality of the votes cast at said election were cast for Thomas Swinburne, who was because of his being an alien ineligible to hold said office; and therefore no one was legally elected at said election, or is entitled by reason thereof to hold said office; and that there is a vacancy in said office which must be filled in the manner prescribed by law; and the said John Dryden must recover of said

Thomas Swinburne his costs expended in this contest in the county court of Kanawha.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED.